WISCONSIN EMPLOYMENT RELATIONS BOARD, Respondent, vs. CHAUFFEURS, TEAMSTERS & HELPERS LOCAL 200 OF I. B. OF T. C. W. & H. OF A., A. F. L. and another, Appellants: NATIONAL WAREHOUSE CORPORATION, Intervenor.*

*September 7—October 5, 1954.*

---

* Motion for rehearing denied, with $25 costs, on December 7, 1954.

358

For the appellants there were briefs by *Padway, Goldberg & Previant,* and oral argument by *David Previant* and *David Leo Uelmen,* all of Milwaukee.

For the respondent Wisconsin Employment Relations Board there was a brief by the *Attorney General* and *Stewart G. Honeck,* deputy attorney general, and *Beatrice Lampert,* assistant attorney general.

For the intervenor National Warehouse Corporation there was a brief by *Whyte, Hirschboeck & Minahan,* attorneys, and *Victor M. Harding* of counsel, all of Milwaukee, and oral argument by *Mr. Harding.*

FAIRCHILD, C. J.   On September 15, 1952, the circuit court for Milwaukee county granted judgment enjoining the

Chauffeurs, Teamsters & Helpers Local 200 of the I. B. of T. C. W. and H. of A., A. F. L., and Frank Ranney from picketing the National Warehouse Corporation's place of business. That decision was based upon a prevailing policy in this state relating to control of labor disputes. Since that decision, and on December 14, 1953, the supreme court of the United States decided, in the case of *Garner v. Teamsters Union* (1953), 346 U. S. 485, 74 Sup. Ct. 161, 98 L. Ed. 228, that the National Labor Relations Board had exclusive jurisdiction in certain cases involving interstate commerce. Because of that ruling, we hold that the circuit court for Milwaukee county lacked jurisdiction in the case involved here on appeal, and therefore, reverse the decision of that circuit court. See also *Grimes & Hauer, Inc., v. Pollock* (Ohio, 1954), 119 N. E. (2d) 889.

However, in view of possible developments in the proceedings before the National Labor Relations Board, should proceedings before that body be had, we call attention to the following *per curiam* ruling by the supreme court of the United States of January 18, 1954, in the case of *Building Trades Council v. Kinard Construction Co.* (1954), 346 U. S. 933, 74 Sup. Ct. 674, 98 L. Ed. 423, on petition for writ of certiorari to the supreme court of Alabama:

"*Per Curiam:* The petition for writ of certiorari is granted, and the judgment is reversed. *Garner v. Teamsters Union,* 346 U. S. 485. Since there has been no clear showing that respondent has applied to the National Labor Relations Board for appropriate relief, or that it would be futile to do so, the court does not pass upon the question suggested by the opinion below of whether the state court could grant its own relief should the board decline to exercise its jurisdiction."

The National Labor Relations Act, 29 USCA, sec. 151 *et seq.,* as originally enacted in 1935 is commonly referred to as the "Wagner Act" and was enacted under the powers vested in the federal government by the commerce clause of the federal constitution for the primary purpose of protecting

the interest of the public so as to relieve it from the evils attendant upon strikes and work stoppages which obstruct the free flow of the national commerce. A considerable segment of public opinion came to the conclusion that the Wagner Act was "one-sided" in favor of labor. As a result of this, congress, in 1947, amended the Wagner Act by the Labor Management Relations Act, 61 U. S. Stats. at L. 136, in an effort to equalize the position of labor and management in labor disputes covered by the act. The preambles to both the original and the amended act contain the following finding:

"Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes. . . ."

Picketing is one of the traditional labor techniques incidental to the achievement of collective bargaining, and therefore, if lawful, is protected by the act. It makes no difference that, as in the instant case, the picketing takes the form of "stranger picketing," *i. e.,* picketing of a primary employer by a union which represents other units in the same industry than the unit being picketed. In the course of development of labor law, the area of a labor dispute has been extended from that of employer and employee in a single unit of an industry or craft to the entire industry or craft. In 1921, Mr. Chief Justice TAFT, speaking for the United States supreme court in *American Steel Foundries v. Tri-City Central Trades Council* (1921), 257 U. S. 184, 209, 42 Sup. Ct. 72, 66 L. Ed. 189, said:

"To render this [their] combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same

trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild."

In *Bayonne Textile Corp. v. American Federation of Silk Workers* (1934), 116 N. J. Eq. 146, 157, 172 Atl. 551, the New Jersey court went still further, saying:

"And it is manifestly not essential to the legality of a [labor] combination that it be confined to the same community."

It will be seen, then, that there existed a *bona fide* "labor dispute" in the instant case arising from "stranger picketing" of the primary employer; and the definition of "labor dispute" in the act itself makes this fact clear when it says that a "labor dispute" includes "any controversy concerning terms, tenure, or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether the disputants* stand in the proximate relation of employer and employee." (Sec. 2 (9) of the act as amended, 29 USCA App., sec. 152 (9).)

When the instant case was before the Wisconsin State Board, that board found that its business "substantially affects the free flow of commerce between states" inasmuch as the company "annually receives for storage from outside of the state merchandise valued substantially in excess of $1,000,000 and exports merchandise stored in its warehouse directly to ports outside of the state of Wisconsin in substantial amounts." (Finding No. 13.) There is no doubt that the National Warehouse Corporation is a link in interstate commerce. The question of how much its business "affects commerce" within the meaning of the act arises in

connection with certain new standards adopted by the National Labor Relations Board, which is the quasi-judicial body created under the original act, and continued under the act as amended, to administer the act. It has the power to make its own rules and regulations and change them from time to time.

On June 30, 1954, and July 15, 1954, and subsequent to the findings and order of the Wisconsin State Board, this body adopted new standards to be used as measuring sticks of its jurisdiction, with a view to relieving itself of many applications involving labor disputes in interstate-commerce businesses too small to substantially affect the commerce of the nation. Sec. 2 (7) of the act, 29 USCA App., sec. 152 (7), defines the terms "affecting commerce" as "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." The new standards thus established by the National Board were to apply to all new cases as well as cases pending, and of course included the instant case. In general, the new standards increased the requirements which had to be met before applications would be accepted by the National Board. Respondent, in the instant case, calls attention to section D of the National Board's release of new jurisdiction standards under date of June 30, 1954 (2 Labor Law Rep. (4th ed.), par. 14, 014), which requires that "intrastate trucking companies and similar firms which are 'links in interstate commerce' do at least $100,000 a year business for other interstate firms in order to come under board jurisdiction." It appears that these standards established by the June 30th release are incorporated into the release of July 15, 1954, where sec. 1 says that board jurisdiction will be asserted "over intrastate trucking companies and similar firms which are links in interstate commerce only if they do at least $100,000 worth of business

annually for other concerns" in the following categories: (1) Firms coming under sec. 1; (2) public utility companies (not involved in this case) and transit systems engaged in interstate commerce if the gross annual revenue from interstate operations amounts to at least $100,000; (3) enterprises furnishing goods or services that become part of the stream of commerce amounting to $100,000 a year or more to concerns in any of these three categories.

Appellant relies on secs. 7 and 8 of the release of July 15, 1954, which rule that board jurisdiction will be taken over "enterprises other than retail establishments which have a direct inflow of goods or materials from out of state valued at $500,000 a year or more" and "enterprises, other than retail establishments, with an indirect inflow of goods or materials valued at $1,000,000 a year or more." There is necessarily no conflict between the rulings of sec. 1 and the combined rulings of secs. 7 and 8. They may exist side by side in the same set of rules, for they must be interpreted as being alternatives. If, therefore, a business covered by the act has a direct inflow of merchandise valued at $500,000, it meets the jurisdictional standards of the board, despite the fact that its volume of business is less than $100,000. Conversely, if its volume of business amounts to $100,000, it meets the jurisdictional standards, despite the fact that the direct inflow of goods is valued at less than $500,000, or that the value of the indirect inflow of goods is less than $1,000,000.

This interpretation of the jurisdictional standards is supported by the decision in *Dorn's House of Miracles, Inc.* (1950), 91 NLRB 632, 633, a case involving a warehouse and five retail stores, with facts similar to those in the present case. The forceful language contained there in the board's findings reflects the serious consideration the board gave to $1,000,000 worth of merchandise moving into the state, where it was said: "Hereafter, *in the interest of certainty, regardless of the nature of the enterprise,* where the indirect inflow totals at least $1,000,000 annually, we shall treat *that*

*factor alone* as a sufficient basis for asserting jurisdiction." There is no reason to believe that the board has changed its attitude in regard to an excess of $1,000,000 worth of goods flowing directly to a warehouse from outside the state; and, on their face, secs. 7 and 8 would apply to the case being appealed here.

It is to be noted that the standards established by the National Board are not absolute. They are set up to guide litigants generally in choosing the proper forum for their complaints. The true criterion for jurisdiction is the effect of the dispute upon the welfare of the nation through its obstruction of the free flow of commerce, the prevention of such obstruction being the primary purpose of the act. What the respondent here calls a "vacuum" in the law is described in *Brown v. Roofers & Waterproofers Union* (D. C. Cal. 1949), 86 Fed. Supp. 50, 55, as a "zone for exercising discretion," where it was said that "The fact that, under a delegation of authority to an administrative officer, there is a zone for the exercise of his discretion does not make the delegation unconstitutional, where congress has prescribed the general standard and has left to him the determination of the precise situation to which the statute will be applied. . . ." The United States supreme court has upheld the board in rejecting jurisdiction in cases even where jurisdiction attached; and the board has, in its discretion, the power to assume jurisdiction where the jurisdictional standards are not met. The true criterion is not the jurisdictional standards but the effect of the dispute on the flow of interstate commerce.

The next point to be considered is whether in the instant case there was an unfair labor practice within the meaning of the amended act. Sec. 10 of the act as amended, 29 USCA App., sec. 160, is the section which gives to the National Labor Board its powers. Sub. (a) of that section empowers the national board "to prevent any person from engaging in *any unfair labor practice* . . . affecting commerce." The

term "unfair labor practice" is defined in sec. 2 (8) of the amended act, 29 USCA App., sec. 152 (8), as meaning any unfair labor practice listed in sec. 8 of the amended act, 29 USCA App., sec. 158. Among such unfair labor practices so listed are:

Sec. 8 (a) (3), 29 USCA App., sec. 158 (a) (3), "It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . ."

Sec. 8 (b) (2), 29 USCA App., sec. 158(b) (2), "It shall be an unfair labor practice for a labor organization or its agents to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section. . . ."

It is evident that in the instant case the employer, National Warehouse Corporation, was being forced through economic pressure either to encourage his nonunion employees to join the union or to discharge them and hire union employees. Such acts on the part of the employer would be a direct violation of sec. 8 (a) (3) of the amended act, 29 USCA App., sec. 158 (a) (3). To "cause or to attempt to cause" such violation on the part of the employer by the union was made an "unfair practice" on the part of a labor organization by the amendment of the act by the Labor Management Relations Act of 1947. It is clear, then, that here we have a situation in which there is an unfair labor practice lying expressly within the scope of the act giving jurisdiction over such unfair practice to the National Labor Relations Board.

We now come to the question of the jurisdiction of the National Labor Relations Board in relation to the jurisdiction of the state over unfair labor practices covered by the act. As enacted in 1935, the National Labor Relations Act contained the provision that "this power," i. e., "to prevent any person from engaging in any unfair labor practice affect-

ing commerce," "shall be exclusive." 29 USCA, sec. 160 (a). This provision was omitted from the amended act. However, the omission by the amendment of 1947 of the provision granting "exclusive" power does not materially affect the exclusive character of the jurisdiction of the National Labor Board, because the deletion was for the purpose of consistency when the proviso clause was added by the 1947 amendment to permit ceding of jurisdiction to state agencies in certain cases. Also, under sec. 10 (j), 29 USCA App., sec. 160 (j), the district courts are *expressly* given jurisdiction to grant injunctions *upon application of the National Board* after the latter has issued a complaint charging an unfair labor practice; and under sec. 10 (1), 29 USCA App., sec. 160 (1), district courts are given jurisdiction to issue injunctions *upon application of an officer or regional attorney of the National Labor Relations Board* in certain cases involving jurisdictional strikes and secondary boycotts.

After empowering the National Board to prevent any unfair labor practice as defined in sec. 8 of the act as amended, sec. 10 (a), 29 USCA App., sec. 160 (a), goes on to say: "This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: . . ." Such comprehensive language certainly expressly excludes state courts from taking jurisdiction of unfair labor practices as defined in the act. Further, the proviso clause, "That the board is empowered by agreement with any agency of any state or territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the state or territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter [National Labor Relations] or

has received a construction inconsistent therewith" allows the State Board jurisdiction only when such jurisdiction is ceded by the National Board and only when the applicable state statute is not inconsistent with the corresponding provision of the National Labor Relations Act. If the state statute is inconsistent, the National Board is not then empowered by congress to cede jurisdiction. It would be difficult to understand why congress should have singled out this particular circumstance in which the state could have jurisdiction if the operation of the various and differing state laws were to be given effect in cases coming under the act. Nowhere in the act is there any express provision for jurisdiction in the state courts such as exists in the case of federal courts in certain cases.

. Appellant cites sec. 111.06 (1) (c) 1 of the Wisconsin statutes as being parallel to sec. 8 (a) (3) of the act as amended, 29 USCA App., sec. 158 (a) (3), set forth above. Sec. 111.06 (1) (c) says that it shall be an unfair labor practice for an employer individually or in concert with others "to encourage or discourage membership in any labor organization, employee agency, committee, association, or representation plan by discrimination in regard to hiring, tenure, or other terms or conditions of employment. . . ." Appellant then cites sec. 111.06 (2) (b) of the Wisconsin statutes, which makes it an unfair labor practice "for an employee, individually or in concert with others: . . . to coerce, intimidate, or induce any employer to interfere with any of his employees in the enjoyment of their legal rights, including those guaranteed in sec. 111.04. . . ." (Sec. 111.04, like sec. 7 of the act, guarantees employees the right to self-organization and to engage in concerted activities for the purpose of collective bargaining; and also the right to refrain from such activities.) Appellant contends that these two Wisconsin statutes are analogous to the two sections above quoted from the national act, as amended. Respondent

also cites sec. 111.06, Wisconsin statutes, but claims that it has no counterpart in the federal law, and that therefore the state has jurisdiction of the instant case, because it is governed by Wisconsin law.

Whether the state and federal laws are analogous or not has no bearing on the initial jurisdiction of the National Board in cases covered by the act. If the laws are analogous, the only result is that, in its discretion, the National Board *may* cede jurisdiction to the state. Sec. 10 (a) of the act as amended, 29 USCA App., sec. 160 (a), makes it clear that the state does not have jurisdiction of this type of case in its own right.

In *Bethlehem Steel Co. v. New York L. R. Board* (1947), 330 U. S. 767, 775, 67 Sup. Ct. 1026, 91 L. Ed. 1234, a case involving certification of a union by the State Board which the National Board declined to certify, it was said: "Comparison of the state and federal statutes will show that both governments have laid hold of the same relationship for regulation, and it involves the same employers and the same employees. Each has delegated to an administrative authority a wide discretion in applying this plan of regulation to specific cases, and they are governed by somewhat different standards. Thus, if both laws are upheld, two administrative bodies are asserting a discretionary control over the same subject matter, . . . They might come out with the same determination, or they might come out with conflicting ones as they have in the past. . . . But the power to decide a matter can hardly be made dependent on the way it is decided. As said by Mr. Justice HOLMES for the court, 'When congress has taken the particular subject matter in hand coincidence is as ineffective as opposition.' "

The fact that Wisconsin has labor laws which apply to other types of labor disputes not "affecting interstate commerce," does not affect the right of the National Board to assume sole jurisdiction over a case of this kind. State laws may still be invoked, for example, in cases involving merely

local trade. Also, the state is free to exercise its police power and to grant injunctions in cases involving fraud and violence. As said in *Garner v. Teamsters Union, supra* (p. 488), where the facts were practically parallel to those in the instant case, "This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the state or it is entirely ungoverned.' In such cases we have declined to find an implied exclusion of state powers. *International Union v. Wisconsin Board,* 336 U. S. 245, 254."

Furthermore, subs. (b) to (1) of sec. 10 of the act as amended, 29 USCA App., sec. 160 (b) to (1), set up a complete machinery for the remedy of disputes in a case affecting interstate commerce, including hearings, investigations, temporary restraining orders, injunctions, and reviews. In *Amazon Cotton Mill Co. v. Textile Workers Union* (4th Cir. 1948), 167 Fed. (2d) 183, 187, 189, it was said, in regard to jurisdiction of federal courts in such cases, and it may be repeated here, ". . . a remedy in the courts not expressly given is not to be inferred; and especially is this true where congress has worked out elaborate administrative machinery for dealing with the whole field of labor relationships, . . . and has provided for the handling of unfair labor practices by an administrative agency equipped for the task." Continuing from the same opinion, "Pertinent as containing language supporting our conclusion here are the decisions in the Southern District of New York, *Douds v. Wine, Liquor & Distillery Workers Union,* D. C., 75 Fed. Supp. 447, and *Fitzgerald v. Douds,* D. C., 76 Fed. Supp. 597, where Judge MEDINA, in denying the motion of a union for an injunction to stay the labor board from proceeding to conduct a representation hearing because of an existing contract with a certified union, said:

" 'This conclusion finds further support in the general scheme of the statute which seems not to contemplate inter-

ference by the district courts by way of review or otherwise in connection with the normal proceedings of the board. It would be strange indeed if, prior to such time as the board made any decision or determination and when it was doing no more than starting a hearing to inquire into the facts, a litigant, fearful that the board might in the end reach a conclusion detrimental to his interests, could hamstring the entire proceeding by an application to the district court for an injunction.' . . .

"If labor unions are permitted to invoke the injunctive process of the courts under the act, so also are employers. If they may invoke jurisdiction of the courts where they themselves have appealed to the labor board, they may invoke it where their adversaries have appealed to that board. It would follow, therefore, that upon the beginning of a proceeding before either the board or a court, the party proceeded against could, and probably would, begin a proceeding in the other tribunal. More than 200 local tribunals of general jurisdiction would be clothed with the special jurisdiction now vested in a unified agency with nation-wide jurisdiction over labor controversies; and it is not difficult to foresee the confusion that would necessarily result. Certainly the statute should not be given an interpretation which would lead to such consequences."

At page 186 of the same decision, it was said by Mr. Justice PARKER: "It is perfectly clear, both from the history of the National Labor Relations Act and from the decisions rendered thereunder, that the purpose of that act was 'to establish a single paramount administrative or quasi-judicial authority in connection with the development of federal American law regarding collective bargaining.' "

As was said in the *Garner Case, supra* (p. 491), "The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal board, precludes state courts from doing so."

It is obvious that the National Labor Relations Act would lose its effectiveness if federal and state courts were allowed to interfere and apply different laws and different principles to cases covered by the act. Meaning is given to the act only if its provisions are applied uniformly to all cases within its jurisdiction. "This chapter [29 USCA App., ch. 6, sec. 101] and sec. 141 *et seq.* [National Labor Relations Act], of this title concerning labor relations and limitations on use of injunctive process at instance of private parties in respect to such labor relations, coincident with powers conferred on labor board to obtain such process in public interest, disclosed congressional intent to prescribe a consistent pattern to provide for a uniform administration of labor relations laws in public interest by public authority. *Mitchell v. Gibbons,* C. A. Mo. 1949, 172 Fed. (2d) 970." 29 USCA App., p. 11, sec. 101.

Since the handing down of the decision by the United States supreme court in the *Garner Case,* a number of state supreme courts have reversed decisions previously made in cases based on circumstances similar to the instant case. See *Gulf Shipside Storage Corp. v. Moore* (La. 1954), 71 So. (2d) 236; *Busch & Sons, Inc., v. Retail Union of New Jersey* (1954), 15 N. J. 226, 104 Atl. (2d) 448; *Cooper Transport Co., Inc., v. I. A. M. Local 778* (Mo. 1954), 26 Labor Cases, par. 68,488; *Truck Drivers, etc., v. Whitfield* (Texas, 1954), 26 Labor Cases, par. 68,538.

It is concluded, therefore, that the complainant here should have made initial application to the National Labor Relations Board for relief.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the proceedings for lack of jurisdiction.

STEINLE, J., took no part.