MILWAUKEE BOSTON STORE COMPANY, Respondent, vs. AMERICAN FEDERATION OF HOSIERY WORKERS, BRANCH 16, A. F. L., and others, Appellants.*

*March 7—April 5, 1955.*

---

* Motion for rehearing denied, with $25 costs, on June 1, 1955.

340

342

For the appellants there were briefs by *Padway, Goldberg & Previant,* attorneys, and *Saul Cooper* and *David Leo Uelmen* of counsel, all of Milwaukee, and oral argument by *Mr. Cooper.*

For the respondent there was a brief by *Lamfrom & Peck,* attorneys, and *Egon W. Peck* and *Jacob L. Bernheim* of counsel, all of Milwaukee, and oral argument by *Mr. Peck* and *Mr. Bernheim.*

CURRIE, J. Before proceeding to the legal issues presented on this appeal we deem it advisable to analyze the conduct of the defendants, including its objectives, which was enjoined by the learned trial court. The picketing was conducted by individuals walking up and down in front of the entranceways of plaintiff's Milwaukee store carrying large signs requesting people not to buy "Belle-Sharmeer" stockings because the employees of the two manufacturing mills were on strike, which pickets also distributed at such entrance-

ways the leaflets hereinbefore described. The strike in which the defendant union was engaged against these two manufacturers had as its purpose the gaining of higher wages, and the combating of unfair labor practices on the part of one of such employers. Therefore, the ultimate objective of the picketing was to promote the interests of the union in such strike by discouraging the purchase of such manufacturers' product, and there can be no doubt as to such ultimate objective being a legal one in so far as it related to these two manufacturers.

However, the fact that the picketing was confined to the sidewalks in close proximity to the entranceways of the Boston Store, while no other retailers of "Belle-Sharmeer" stockings were picketed, makes it apparent that there was also an objective directed against that store. Such objective was to cause the store's customers to refrain from buying any of the store's stock on hand of "Belle-Sharmeer" stockings so that the store would have no need of placing further orders for such stockings with the manufacturers.

This particular type of picketing has been referred to in some of the cases from other jurisdictions as "product picketing" and has been held not to be illegal in the absence of a statute making it so. *Goldfinger v. Feintuch* (1937), 276 N. Y. 281, 11 N. E. (2d) 910, 116 A. L. R. 477; *Fortenbury v. Superior Court* (1940), 16 Cal. (2d) 405, 106 Pac. (2d) 411; and *Galler v. Slurzberg* (1953), 27 N. J. Super. 139, 99 Atl. (2d) 164. The facts in the instant case are indistinguishable from those of the three foregoing-cited cases so far as governing legal principles are concerned, and, therefore, the injunctional order attacked on this appeal must be grounded upon a violation of Wisconsin statutes if it is to be sustained.

The learned trial court found that the conduct of the defendants constituted a violation of sec. 103.535, Stats., reading as follows:

"It shall be unlawful for anyone to picket, or induce others to picket, *the establishment,* employees, supply or delivery vehicles, *or customers of anyone engaged in business,* or to interfere with his business, or interfere with any person or persons desiring to transact or transacting business with him, when no labor dispute, as defined in subsection (3) of section 103.62, exists between *such employer* and his employees or their representatives." (Italics supplied.)

Sub. (3) of sec. 103.62, Stats., referred to therein provides:

"The term 'labor dispute' means any controversy between an employer and the majority of his employees in a collective-bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives. Any organization with which either the employer or such majority is affiliated may be considered a party to the labor dispute. The provisions of this subsection shall supersede any provision of the statutes in conflict therewith."

Counsel for the defendants strenuously contend that the words *"anyone engaged in business"* and *"such employer"* of sec. 103.535, Stats., refer to the two manufacturers of "Belle-Sharmeer" stockings located in Tennessee and Georgia and not to the Boston Store. If so construed, the word *"customers"* of the statute would then refer to the Boston Store, and, inasmuch as there is a valid labor dispute between the union and the two out-of-state manufacturers which meets the definition of sec. 103.62 (3), there would be no interdiction against the picketing by defendants of the Boston Store as such customer.

However, we deem a much more logical construction of sec. 103.535, Stats., to be that the words *"anyone engaged in business"* and *"such employer"* refer to the Boston Store and not to the two out-of-state manufacturers. Under such construction defendants did picket the *"customers"* of the Boston Store, and the placing of the pickets at the entrance-

ways to plaintiff's store constituted a physical picketing of plaintiff's *"establishment."* By this we do not wish to intimate that the pickets stationed at such entranceways in any way impeded the ingress and egress of plaintiff's customers or employees entering or leaving the store because it is conceded that this was not the case.

Having concluded that the trial court correctly found that defendants' conduct, in picketing plaintiff's store, constituted a violation of sec. 103.535, Stats., because no labor dispute existed between plaintiff and its employees, or their representatives, the next issue with which we are faced is whether sec. 103.53, nevertheless, prohibited the trial court from entering an injunction against the defendants. This statute is modeled after the Federal Norris-La Guardia Act and prohibits the use of injunctions to enjoin conduct which expressly is declared lawful by such statute. The statute legalizes certain acts which are often engaged in by employees and labor unions. The pertinent portions of the statute applicable to the instant case are:

"(1) The following acts, whether performed singly or in concert, shall be legal: . . .

"(f) Ceasing to patronize or to employ any person or persons, but nothing herein shall be construed to legalize a secondary boycott; . . .

"(2) No court, nor any judge or judges thereof, shall have jurisdiction to issue any restraining order or temporary or permanent injunction which, in specific or general terms, prohibits any person or persons from doing, whether singly or in concert, any of the foregoing acts."

Did the acts of picketing on the part of the defendants constitute a secondary boycott? Ch. 103, Stats., contains no definition of a secondary boycott, but sec. 111.02 (12) of the Wisconsin Employment Peace Act does. However, sec. 111.02 provides that the definitions contained therein,

including that of a secondary boycott, apply when the defined terms are used "in this subchapter," referring thereby to subchapter I of ch. 111, comprising the Employment Peace Act. Sec. 111.06 (2) of such act makes it an unfair labor practice for "an employee individually or in concert with others" . . . "(g) To engage in a secondary boycott." Sec. 111.02 (3) defines an employee for the purposes of the Employment Peace Act as ". . . any person, other than an independent contractor, working for another for hire in the state of Wisconsin in a nonexecutive or nonsupervisory capacity, . . ." There are no allegations in the complaint or the affidavits considered by the trial court that any Wisconsin employee engaged in the picketing of plaintiff's store. The mere allegation in the complaint that the two branches of the union made parties defendant herein had offices in Milwaukee is insufficient to establish that any Wisconsin employees engaged in the picketing. We, therefore, conclude that the definition of secondary boycott contained in sec. 111.02 (12) may not be resorted to by us in answering the question of whether the acts of the defendants constituted a secondary boycott, and we must look to the common law for our answer.

In an article entitled "Labor and the Secondary Boycott," 15 Washington Law Review and State Bar Journal (1940), at page 137, by Robert C. Barnard and Robert W. Graham, the authors point out the perplexing difficulties the courts have had in defining the term "secondary boycott," and state that the traditional definition of a secondary boycott is that given by Mr. Justice PITNEY in his opinion in *Duplex Printing Press Co. v. Deering* (1921), 254 U. S. 443, 466, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, wherein the distinction between a primary and a secondary boycott was made to depend upon whether *"coercive pressure"* was exercised upon the actual or prospective customers of the employer engaged in the labor dispute. Another definition of

secondary boycott also set forth in such article is the following appearing in an opinion of the Washington supreme court in *United Union Brewing Co. v. Beck* (1939), 200 Wash. 474, 490, 93 Pac. (2d) 772, 779:

"While the term 'secondary boycott' is of somewhat vague signification and has no precise and exclusive denotation, the courts, both federal and state, are agreed that any combination will be held to be a secondary boycott if its purpose and effect are to coerce customers or patrons, through fear of loss or bodily harm, to withhold or withdraw their business relations from the employer who is under attack."

Barnard and Graham voice the criticism that courts have been prone to equate "secondary boycott" with illegality, but state in an analytical sense any situation wherein pressure is exerted against a third party to affect the business of the employer constitutes a secondary boycott. It is their conclusion that there may be legal as well as illegal secondary boycotts at common law, an example of a legal secondary boycott being the "product" picketing upheld as legal by the New York court of appeals in *Goldfinger v. Feintuch, supra.* As an illustration of an attempt to maintain verbal consistency at the expense of analytical treatment of the problem, the authors cite by footnote the statement by Judge LEHMAN in his concurring opinion in the *Goldfinger Case* that the product picketing engaged in by the union in that case was not a "secondary boycott," which statement was not supported by any citation of authority.

We are of the opinion that the proper test to apply in determining whether defendants' picketing activities in the instant case constituted a secondary boycott is whether any coercion was exerted thereby on the Boston Store. An illuminating debate on the question of whether picketing does involve an element of coercion is set forth by the articles on the subject appearing in 39 Virginia Law Review (1953), at pages 1023 and 1053, by Professors Edgar A. Jones, Jr.,

and Charles O. Gregory. However, Professor Jones, who opposes the view that picketing is coercive, does make this significant admission (p. 1025):

"In the free speech cases this feeling [that picketing is coercion] has produced the prevailing view that picketing is 'more than' free speech. The 'more' apparently represents some conception of coercion. Indeed, the supreme court of the United States has indicated that its current assumption may be that 'picketing is coercion.'"

It is Professor Jones' theme that the use of the term "coercion" should never have been applied by the courts to peaceful picketing, but should have been confined to situations where a person's will has been overwhelmed by force. However, in our task of seeking to determine whether defendants' conduct constituted a secondary boycott we must give coercion the meaning almost universally attributed to it in the court decisions which have dealt with picketing and boycotts, viz., the exerting of economic pressure. In our use of "coercion" in this sense we intend no connotation of either illegality *per se* or of intimidation produced by threat of use of physical force.

That picketing usually does embody with it an element of coercion was recognized by the United States supreme court in its decisions in *Building Service Union v. Gazzam* (1950), 339 U. S. 532, 537, 70 Sup. Ct. 784, 94 L. Ed. 1045, and *Hughes v. Superior Court* (1950), 339 U. S. 460, 465, 70 Sup. Ct. 718, 94 L. Ed. 985. In the *Gazzam Case,* Mr. Justice MINTON, speaking for the court, declared that "picketing is more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey." Mr. Justice FRANKFURTER wrote the opinion in the *Hughes Case,* and stated therein:

"Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same

charge as do those patrolling a picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. See Gregory, Labor and the Law 346–48 (rev. ed. 1949); Teller, Picketing and Free Speech, 56 Harv. L. Rev. 180, 200–02 (1942); Dodd, Picketing and Free Speech: A Dissent, 56 Harv. L. Rev. 513, 517 (1943); Hellerstein, Picketing Legislation and the Courts, 10 N. C. L. Rev. 158, 186–87, n. 135 (1932)."

The principal argument advanced by defendants' counsel as to why the activities of the defendants did not constitute a secondary boycott is because the picketing was not directed against the Boston Store but against the product ("Belle-Sharmeer" stockings) manufactured by the employers with whom the labor dispute existed. This is merely another way of stating that if there was a boycott it was primary in nature and not secondary. With this contention we cannot agree. As pointed out in the quoted extracts from the United States supreme court opinion in the *Hughes Case,* the purpose of picketing is to exert influence and it produces consequences unlike those flowing from appeals by the printed word. The business of any retailer is bound to be adversely affected by the patrolling of pickets carrying signs adjacent to the entranceways of the store. It is true that the wording on the signs used by the pickets, and the pamphlets distributed by them, made no demands upon the Boston Store and the worded request not to buy "Belle-Sharmeer" stockings would apply equally to any other retailer selling such stockings as well as to the Boston Store. Nevertheless, the mere stationing of the pickets at the entranceways of the Boston Store exerted an economic pressure upon plaintiff that was not exerted against other Milwaukee retailers of such stockings. Can there be any doubt in anyone's mind that defendants did intend to exert such pressure in order to cause the

Boston Store to cease ordering further stockings from the manufacturers? That such result was intended is the only reasonable inference that can be drawn from the facts of this case.

One of the great and universally respected jurists of our time, Judge LEARNED HAND, in *International Brotherhood of Electric Workers v. National L. R. Board* (2d Cir. 1950), 181 Fed. (2d) 34, 37 (affirmed (1951), 341 U. S. 694, 71 Sup. Ct. 954, 95 L. Ed. 1299), in distinguishing a secondary boycott from a primary one, declared:

"The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands."

In the instant case the picketing of the premises of the Boston Store was a sanction which bore upon the plaintiff, who was a third party to the dispute between the union and the manufacturers, with the aim to compel the Boston Store to cease doing business with such manufacturers. We consider that the picketing activities of the defendants constituted a secondary boycott, and, therefore, the provisions of sec. 103.53, Stats., did not protect such conduct from being enjoined, if some other statute, or statutes, rendered such conduct unlawful.

Counsel for defendants strenuously contend that the injunction entered by the trial court is contrary to the defendants' right of free speech as guaranteed to the defendants by the First and Fourteenth amendments to the United States constitution. Counsel attempt to draw no distinction between the picketing and the pamphleteering, both of which were enjoined. We consider that there is a very obvious distinction, and, if defendants' pamphlets had been distributed other than by means of pickets, the constitutional guaranties of

free speech would have cloaked them with immunity. It is because the United States supreme court has held that picketing embodies more than free speech that such court has upheld the rights of states to prohibit even peaceful picketing under certain, but not all, circumstances.

We consider that this issue of free speech in the instant case has been ruled adversely to the contentions advanced in behalf of the defendants by the decision of the United States supreme court in *International Brotherhood of Electrical Workers v. National L. R. Board* (1951), 341 U. S. 694, 71 Sup. Ct. 954, 95 L. Ed. 1299. That case involved the constitutionality of sec. 8 (b) (4) (A) of the National Labor Relations Act, 29 USCA, Labor, sec. 158 (b) (4), as amended by the Labor Management Relations Act of 1947 (the Taft-Hartley Act), which is commonly referred to as the "secondary boycott" section of the Taft-Hartley Act, as applied to a fact situation of peaceful picketing. A New York general contractor undertook a contract to build a dwelling house in Connecticut. He subcontracted the electrical wiring to one subcontractor and the carpentry to another subcontractor. The electrical subcontractor employed two non-union employees to work on the job, who had completed the roughing in of the electrical work and had left the premises, but there was further work to be done by the electrical subcontractor under his subcontract at a later time. Two days later a business representative of the Electricians Union commenced to picket the premises carrying a placard which read, "This job is unfair to organized labor: I. B. E. W. 501 A. F. L.," and he also telephoned to the general contractor saying that the electrical subcontractor was "unfair" and would have to be replaced by a union contractor, and, if he did not, he would not receive any skilled trades to complete the job. The carpenter-contractor and his employees, who were members of the Carpenters Union, then quit work and left the premises. As a result of a complaint

filed by the electrical subcontractor, the national labor relations board instituted proceedings before such board, and an order was entered enjoining the Electrical Union and its business representative from inducing or encouraging the employees of the carpenter-subcontractor, or any other employer, by picketing or other conduct where an object thereof was to force or require the general contractor to cease doing business with the electrical subcontractor. The United States court of appeals, in the opinion quoted *supra* by Judge LEARNED HAND, ordered enforcement of such order, and the supreme court granted certiorari. That court held that sec. 8 (b) (4) (A) did prohibit peaceful picketing constituting a secondary boycott. In passing on the contention, that as so construed the statute would be unconstitutional, the opinion of the court by Mr. Justice BURTON stated (p. 705):

"The prohibition of inducement or encouragement of secondary pressure by sec. 8 (b) (4) (A) carries no unconstitutional abridgment of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of sec. 8 (b) (4) (A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First amendment. This provision has been sustained by several courts of appeals. The substantive evil condemned by congress in sec. 8 (b) (4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why congress may not do likewise."

By footnote, the opinion cited in support of the statement that the supreme court had "recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives," the following cases: *Building Service Union v. Gazzam, supra; International Brotherhood of Teamsters v. Hanke* (1950), 339 U. S. 470, 70 Sup. Ct. 773, 94 L. Ed. 995; *Hughes v. Superior Court, supra;*

*Giboney v. Empire Storage Co.* (1949), 336 U. S. 490, 69 Sup. Ct. 684, 93 L. Ed. 834. A case even more in point than those cited is *Carpenters & Joiners Union v. Ritter's Cafe* (1942), 315 U. S. 722, 62 Sup. Ct. 807, 86 L. Ed. 1143, in which the United States supreme court did uphold state action in enjoining peaceful secondary picketing. The policy of the state of Wisconsin, as embodied in sec. 103.535, Stats., in so far as applicable to the facts of the instant case, is to proscribe the picketing of a retailer, not a party to the labor dispute existing between the union and the manufacturers from which it bought stockings for resale, for the purpose of inducing the retailer to cease doing business with such manufacturers. We deem this objective to be closely comparable to that of congress in enacting sec. 8 (b) (4) (A) of the National Labor Relations Act. For a clear-cut statement of such congressional policy we quote again from Judge HAND's opinion in *International Brotherhood of Electrical Workers v. National L. R. Board, supra,* as follows (181 Fed. (2d) 40) :

"Congress, in the search for a compromise between the conflicting interests of employees in collective bargaining and that of neutrals in avoiding involvements in quarrels not their own, decided to draw a line at secondary boycotts; and the propriety of decision is not for us."

With equal candor, we state that the wisdom of the policy which has been enacted into law by secs. 103.535 and 103.62 (3), Stats., is solely for the legislature to determine and not this court. It is the function of this court to pass on the constitutionality of such statutes, and it is our conclusion that, as applied to the facts of this case, the prohibition by these statutes of defendants' secondary-picketing activities does not violate the free-speech guaranties of the First and Fourteenth amendments to the United States constitution.

Counsel for the defendants further urge that if sec. 103.535, Stats., is to be construed as prohibiting defendants'

picketing because of the fact that plaintiff's Boston Store was not a party to a labor dispute, as "labor dispute" is defined by sec. 103.62 (3), then such statute is unconstitutional under the holdings of the United States supreme court in *Bakery & Pastry Drivers v. Wohl* (1942), 315 U. S. 769, 62 Sup. Ct. 816, 86 L. Ed. 1178; and *American Federation of Labor v. Swing* (1941), 312 U. S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855.

In the *Wohl Case* a labor dispute existed between the Bakers Union and truck-driver peddlers who owned their own delivery trucks and operated as independent contractors buying bakery goods from bakeries and then reselling them to their customers. The union then picketed some of the bakeries from whom two of such peddlers purchased their bakery goods. The New York court enjoined such picketing, and held that no labor dispute existed within the meaning of the New York statutes. The United States supreme court reversed and we consider the gist of the opinion to be contained in the following statement from the opinion written by Mr. Justice JACKSON (p. 775):

"A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual. But so far as we can tell, respondents' mobility and their insulation from the public as middlemen made it practically impossible for petitioners to make known their legitimate grievances to the public whose patronage was sustaining the peddler system except by the means here employed and contemplated; and those means are such as to have slight, if any, repercussions upon the interests of strangers to the issue."

As we construe the decision in the *Wohl Case,* the supreme court held that a labor dispute did exist between the two bakery peddlers and the union and, because of the ambulatory nature of the bakery peddlers' business, the peaceful picketing of the bakeries which formed their source of supply was in reality a case of primary rather than secondary picketing.

Therefore, the picketing being primary in nature, the incidental injury to the bakeries did not justify the state in enjoining the same. The case is closely akin to those situations where a union pickets a particular contractor working on a construction job with whom the union has a labor dispute, and there are one or more other contractors working on the same premises who are adversely affected by the picketing. It has often been held in such a situation that the picketing is primary in nature.

In the case of *American Federation of Labor v. Swing, supra,* the union tried unsuccessfully to unionize Swing's beauty parlor and then resorted to picketing the establishment. An Illinois intermediate appellate court entered a decree providing for a permanent injunction against the union, which decree recited (p. 324), "that this court and the supreme court of this state have held in this case, that, under the law of this state, peaceful picketing or peaceful persuasion are unlawful when conducted by strangers to the employer (*i. e.,* where there is not a proximate relation of employees and employer), and that appellants are entitled in this case to relief by injunction against the threat of such peaceful picketing or persuasion by appellees." The Illinois supreme court dismissed a writ of error by the union to review such decree. The United States supreme court reversed and in the opinion by Mr. Justice FRANKFURTER it was stated (p. 326):

"A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries v. Tri-City Council,* 257 U. S. 184, 209 [66 L. Ed. 189, 199, 42 Sup. Ct. 72, 27 A. L. R. 360]. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

The *Swing Case* involved a case of *primary* as distinguished from *secondary picketing* because the labor dispute which the United States supreme court found existed was directly between the union and Swing. David L. Benetar and Robert C. Isaacs, in an article in 40 American Bar Association Journal, 848, 850, state that "the complete legality of stranger picketing was established" by the *Swing Case* and we consider that this view is rather widely shared by those members of the legal profession who specialize in labor law.

The crucial question in connection with the possible application of the holding in the *Swing Case* to the case at bar would seem to be that of whether the defendants are in a position to urge the unconstitutionality of sec. 103.535, Stats., because the legislature possibly may have drawn "the circle of economic competition between employers and workers" too tightly, in a situation which involves primary picketing. In the instant case there is no claim made that the Boston Store was engaged in a "labor dispute" of any nature whatsoever, and it is conceded that the only existing labor dispute in this case was that between the union and the two out-of-state manufacturers. Therefore, the union cannot have been prejudiced in this case by the definition of "labor dispute" contained in sec. 103.62 (3) and adopted by reference into sec. 103.535.

The generally accepted rule is that a party may not urge the unconstitutionality of a statute upon a point not affecting his rights. *Anderson v. State* (1936), 221 Wis. 78 (syl. 8), 265 N. W. 210; *Southern R. Co. v. King* (1910), 217 U. S. 524, 534, 30 Sup. Ct. 594, 54 L. Ed. 868; *Turpin v. Lemon* (1902), 187 U. S. 51, 23 Sup. Ct. 20, 47 L. Ed. 70; *Mesaba Loan Co. v. Sher* (1938), 203 Minn. 589, 595, 282 N. W. 823, 827; *Benson v. Schneider* (N. D. 1955), 68 N. W. (2d) 665, 670. In 16 C. J. S., Constitutional Law, p. 163, sec. 76, it is stated, "It is not sufficient [in order to entitle a

person to attack the constitutionality of a statute] that the statute is unconstitutional as to other persons or classes of persons." We, therefore, are of the opinion that defendants may not attack the constitutionality of sec. 103.535, Stats., on the ground that the definition of a "labor dispute" adopted therein from sec. 103.62 (3) is too narrow.

A further issue raised in behalf of the defendants is whether congress has pre-empted the area of the picketing involved in this case. Among the authorities cited in support of such contention are the recent decisions of *Wisconsin E. R. Board v. Chauffeurs, etc., Local 200* (1954), 267 Wis. 356, 66 N. W. (2d) 318; and *Garner v. Teamsters Union* (1953), 346 U. S. 485, 74 Sup. Ct. 161, 98 L. Ed. 228. However, those cases were concerned with a situation where the employer was engaged in a business activity affecting commerce within the meaning of the National Labor Relations Act, and it was sought by state action to enjoin alleged union activities which were prohibited as "unfair labor practices" under such federal act as amended by the Labor Management Relations Act of 1947. No ceding of jurisdiction to regulate such activities by the national labor relations board to the states had occurred. Such cases held that congress had clearly pre-empted such field and in that situation there is no concurrent jurisdiction by the states.

Although congress, by the enactment of sec. 8 (b) (4), has made unlawful certain kinds of secondary boycotts and secondary picketing, it has not made unlawful the type of secondary picketing engaged in by the defendants in the instant case. The type of secondary picketing which is proscribed by the federal act is that which involves coercion or restraint of the *employees* of a secondary or neutral employer with the object of persuading such employees to take concerted action. The material portions of sec. 8 (b) (4) of the National Labor Relations Act on this issue are:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(4) to engage in, or to induce or encourage the *employees of any employer* to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; . . ." (Italics supplied.)

In the instant case, the picketing by defendants did not exert any pressure upon the employees of the Boston Store to engage in any concerted effort to refuse to do anything with respect to "Belle-Sharmeer" stockings being sold in the store. The economic pressure exerted by defendants' picketing was directly upon the Boston Store and not indirectly through its employees. As the United States supreme court stated in *National L. R. Board v. International Rice Milling Co.* (1951), 341 U. S. 665, 671, 71 Sup. Ct. 961, 95 L. Ed. 1277, the proscriptions of sec. 8 (b) (4) of the National Labor Relations Act "are expressly limited to the inducement or encouragement of *concerted* conduct by the employees of the neutral employer." Therefore, the national labor relations board would have had no power to assume jurisdiction or prohibit such secondary picketing by the defendants herein.

In *Garner v. Teamsters Union, supra,* the United States supreme court stated (p. 488) :

"This is not an instance of injurious conduct which the National Labor Relations Board is without express power to prevent and which therefore either is 'governable by the state or it is entirely ungoverned.' *In such cases we have*

*declined to find an implied exclusion of state powers. International Union v. Wisconsin Board, 336 U. S. 245, 254 [93 L. Ed. 651, 663, 69 Sup. Ct. 516]."* (Emphasis supplied.)

We deem that the foregoing extract from the *Garner Case* opinion, if not qualified by another portion of such opinion hereinafter considered, would be controlling and require this court to hold that there has been no pre-emption by congress over the type of secondary picketing enjoined by the trial court.

Such other statement contained in the United States supreme court's opinion in the *Garner Case* to which we refer declares (p. 499) :

"The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the National Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to fall within its prohibitions. Otherwise, it is implicit in the act that the public interest is served by freedom of labor to use the ,weapon of picketing. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal act prohibits."

The foregoing extract from the *Garner Case* was quoted with approval by the United States supreme court in *Weber v. Anheuser-Busch, Inc.,* 348 U. S. 468, 75 Sup. Ct. 480, 99 L. Ed. 546. In this latter case the respondent brewing company had sought relief against strike activities of the Machinists Union (I. A. M.) from the national labor relations board, which ruled that such conduct was not a violation of sec. 8 (b) (4) (D) of the Taft-Hartley Act. The company then sought an injunction in the Missouri state court on the ground that I. A. M.'s conduct constituted an illegal conspiracy in restraint of trade in violation of Missouri common

law and restraint-of-trade statutes, which injunction was granted and affirmed on appeal by the Missouri supreme court. The United States supreme court granted certiorari and reversed on the ground that the national labor relations board, in ruling that I. A. M.'s conduct did not violate sub. (D) of sec. 8 (b) (4) of the Taft-Hartley Act, did not hold that there was no violation of subs. (A) or (B) of such section. The United States supreme court stressed the fact that the company in the first instance had filed charges of "unfair labor practices" under the Taft-Hartley Act with the national labor relations board and that fact required the state court to decline jurisdiction under the decision in the *Garner Case* until such board had definitely ruled that the conduct of the union did not constitute an unfair labor practice under the federal act. From the scanty statement of facts in the opinion an inference exists that the picketing might have exerted pressure upon employees of a common carrier moving cars in and out of the company's premises, which would clearly distinguish the case from the case at bar.

We had hoped that *Weber v. Anheuser-Busch, Inc.,* would clarify the confusion that was created by the two apparently conflicting statements we have quoted *supra* from the *Garner Case,* but must confess that it has not. For example, the United States supreme court in *Weber v. Anheuser-Busch, Inc., supra,* states (p. 480) :

"But as the opinion in that case [the *Garner Case*] recalled, the Labor Management Relations Act 'leaves much to the states, though congress has refrained from telling us how much.' 346 U. S., at 488. This penumbral area can be rendered progressively clear only by the course of litigation."

This court is not convinced that congress by the enactment of the Taft-Hartley Act intended to exclude all state control over secondary picketing of neutrals engaged in a business or activity affecting commerce where such secondary picketing clearly does not constitute an unfair labor practice under

the federal act. Until such time as the United States supreme court has ruled to the contrary, we believe it to be our duty to hold that there has been no pre-emption by congress over the type of secondary picketing of neutrals herein enjoined by the trial court in carrying out the policy of this state as expressed in its statutes prohibiting the same. We hope the United States supreme court will pass directly on this important question in the not too distant future.

Closely allied with the issue of federal pre-emption is the contention of defendants' counsel that the picketing engaged in by defendants is protected by sec. 7 of the National Labor Relations Act,[1] on the ground that the same constituted *"concerted activities"* within the provisions of such section for the legitimate objective of effectuating the union's strike against the two hosiery manufacturers. That sec. 7 of the act does not have the effect of legalizing defendants' picketing of the Boston Store is made clear by the following passage from Mr. Justice JACKSON's opinion in *International Union v. Wisconsin E. R. Board* (1949), 336 U. S. 245, 257, 69 Sup. Ct. 516, 93 L. Ed. 651:

"In the light of labor movement history, the purpose of the quoted provision of the statute [sec. 7] becomes clear. The most effective legal weapon against the struggling labor union was the doctrine that concerted activities were conspiracies, and for that reason illegal. Section 7 of the National Labor Relations Act took this conspiracy weapon away from the employer in employment relations which affect interstate commerce. No longer can any state, as to relations within reach of the act, treat otherwise lawful activities to aid unionization as an illegal conspiracy merely because

---

[1] Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities. . . . 61 Stats. at L., p. 140, ch. 120, 29 USCA, Labor, sec. 157.

they are undertaken by many persons acting in concert. *But because legal conduct may not be made illegal by concert, it does not mean that otherwise illegal action is made legal by concert."* (Emphasis supplied.)

The injunctional order appealed from perpetually restrained and enjoined the defendants until the further order of the court as follows:

"a. From directly or indirectly establishing and maintaining, or causing to be established or maintained, any pickets or patrols in front of plaintiff's entranceways and show windows, and, generally, in front of plaintiff's business establishment fronting West Wisconsin avenue, North Fourth street, and West Michigan street, all in the city and county of Milwaukee, state of Wisconsin.

"b. From displaying, or causing to be displayed, any signs or placards anywhere at or near the plaintiff's establishment, requesting the public not to purchase stockings of the trade name 'Belle-Sharmeer' sold by plaintiff, or requesting the public not.to purchase any other goods or articles sold by plaintiff.

"c. From distributing, or causing to be distributed, any leaflets or handbills anywhere at or near plaintiff's business establishment, requesting the public not to purchase 'Belle-Sharmeer' stockings sold by plaintiff, or requesting the public not to purchase any other goods or articles sold by plaintiff.

"d. From inducing or persuading, or causing others to induce or persuade, the public, by any means whatsoever, to decline to purchase from the plaintiff stockings of the trade name 'Belle-Sharmeer' or any other articles or goods sold by plaintiff.

"e. From doing or causing to be done any other act or thing, any or all of which might suggest or give the impression to the public, in private or public conveyances or on foot, that a labor dispute was or is in progress between plaintiff and its employees, or between plaintiff and the defendants."

We construe the foregoing-quoted language of paragraphs c. and d. of the injunctional order as enjoining the pam-

phleteering even if disassociated from the picketing. As so construed the order clearly violates the free-speech guaranties of the First and Fourteenth amendments of the United States constitution. Therefore, the order should be modified by striking therefrom said two paragraphs.

*By the Court.*—The order appealed from is modified by striking therefrom paragraphs c. and d. thereof and, as so modified, is affirmed. Neither party shall tax costs on this appeal, the appellants to pay the clerk's fees.