**NICHOLSON et, Plaintiffs, v. VENDING MACHINE SERVICE EMPLOYEES, LOCAL UNION NO. 410-A et, Defendants.**

Common Pleas Court, Summit County.

No. 182931. Decided February 28, 1952.

Clarence W. May, of Brouse, McDowell, May, Bierce and Wortman, Akron, James W. Matz, of Helmkamp, Matz and Petersilge, Akron, for plaintiffs.

Paul C. Weick, Kenneth A. Mason, of Weick and Mason, Akron, for defendants.

## OPINION

By WATTERS, J.

### FACTS AS FOUND BY THE COURT.

The plaintiffs, Harry Nicholson, et al, are the owners of a restaurant and bar located at 1307 South Main Street, Akron, Ohio, open twenty-four hours, all seven days of the week.

Installed in the restaurant and bar is a musical box owned and installed by Nick Haradakis, who hires no one to service said Juke box, and who does not belong to the defendant union (Vending Machine Service Employees, Local Union No. 410-A) or any union.

The music box is coin operated by patrons who select their record at their tables or booths or at the bar, and insert a

coin which sets in motion the musical box which is played electrically.

Haradakis testified that he installed the wiring, etc. himself, and denied that he ever had any helpers. although he did at least at "20 Bar" on West Bowery Street. The money was divided between the plaintiffs and Nick Haradakis. We spent a long time trying to find out from Nick what the machine took in. He was an extremely evasive witness all the way through. The gross "take" is probably a weekly average of thirty-five dollars.

The other defendant, Vic Letzel, is the business agent of said union. Said union is affiliated internationally with the Teamsters Union A. F. of L. Haradakis likewise does not belong to the Summit County Automotive Operators Association, an organization of juke box owners, which association is not a party to this action.

The waitresses, bar tenders, etc. who work for plaintiffs are members of the A. F. of L. union covering such work. There is no dispute between the plaintiffs and their said union employees, waitresses, bar tenders, etc.

The dispute is that the plaintiffs have in their place of business a juke box which is serviced by the owner thereof, Nick Haradakis, who is not a member of the defendant union.

Said union has an agreement or contract with the Summit County Automotive Music Operators Association and the Union (Plaintiffs' Exhibit 1) and a form of agreement or contract with those like Haradakis who do not belong to said Summit County Automotive Music Operators Association, and who either service the music box personally or through employees. (Plaintiffs' Exhibit 8.)

This proposed agreement as presented to Haradakis was indefinite as to what cash bond he or those like him would have had to furnish, and was indefinite as to the wage scale he would have had to pay if he did hire employees to service the music boxes he owns and lets out.

But Haradakis claims he has no employees, and I am sure would not have joined the union no matter what the rate of wage was or what the amount of the cash bond required was to be.

The union has since adopted a new proposed agreement (Defendant's Exhibit B) in which these matters are now definitely covered, but which the court feels it cannot consider in evidence in this case. Even if considered this evidence would not change the court's decision.

The defendant union, and the defendant Letzel, after attempting to get Haradakis to sign an agreement and become a

member of the defendant union, and after attempting to get plaintiffs to persuade Haradakis to join, or to put in a music box that was union serviced upon their refusal to do so, commenced picketing and bannering at plaintiffs' place of business. The first picketing started October 26, 1951, and continued through November 1, 1951. The next picketing started November 8, 1951, and continued to November 10, 1951, when halted by the temporary injunction issued by another Judge of this Court, who then set the case for trial on its merits.

The number of pickets engaged differed, and the actual number of hours of picketing each day varied, but the picketing extended roughly speaking between the hours of 6 A. M. to 5 P. M. The defendant Letzel was present practically at all times while picketing took place. The other pickets were members of the Teamsters Union with which the defendant union is affiliated.

The pickets carried various banners at the various times with various printed or painted words thereon which purported to acquaint the public with the nature of the dispute, under the freedom of speech doctrine recognized in labor disputes and otherwise. The court will discuss these banners more fully later. We do not have any of these banners in evidence, but only photographs of them supplied by both sides.

The evidence shows no violence and no intimidation and no threats. Patrons of plaintiffs' place were not interfered with personally. Mr. Letzel, the business agent, when truck drivers would appear with deliveries or to solicit orders, would talk to them and ask their cooperation. There is no evidence that the true dispute was directly misrepresented to them by the defendants. They being members mostly of the Teamsters Union were reluctant to cross any picket line, especially one of a union affiliated with the Teamsters Union. So they refused to cross the line, or after calling their union were apparently advised against it until their union could check fully. In any event many members of that union, the teamsters, did testify for plaintiffs as to just what happened, which shows at least a friendly feeling toward plaintiffs in the situation.

As a result of non deliveries plaintiffs were deprived of some supplies, but the matter had not reached such a stage where plaintiffs could not carry on their business as far as the matter went.

Plaintiffs claim that the conduct of the defendants herein, through picketing, bannering, etc. is an unlawful interference with plaintiffs' personal, property and contractual rights, and is an unlawful restraint of the trade and business carried

on by the plaintiffs herein, and that said conduct on the part of the defendants herein constitutes an unlawful secondary boycott, and pray for a permanent injunction against all picketing, bannering, and such claimed unlawful conduct.

The defendants on the other hand claim the right to peaceably picket and to banner said plaintiffs' business under the 1st and 14th Amendments to the United States Constitution and under **Article I, Section 11 of the Ohio Constitution** which, among other things, guarantee the right of freedom of speech.

## DISCUSSION OF THE LAW

This court, on August 24, 1948, decided the case of **Iacomini Restaurant Inc. v. Hotel and Restaurant Employees and Bartenders Local No. 181, et al, 54 Abs 33; 38 O. O. 552,** and 85 N. E. 2nd, 534.

The syllabus as approved by this court held:

"A labor union does not lose its right to peacefully picket a non union business where the object is to secure a closed shop."

In that case the business was non-union. There was no dispute of any kind between the employer and his employees. The union was picketing to force the employees to join the union, and to force the employer to get them to join, and to secure a closed shop. That case was affirmed by our Ninth District Court of Appeals, November 23, 1949, in Case No. 3964.

See also **Clarks Lunch v. Waiters Union, 22 Oh Ap, 265.**

This court, on October 11, 1949, decided the case of **Foutts, Plaintiff, v. Journeymen Barbers Local 105, etc., Defendants.** Summit County Common Pleas No. 169,512, which appeared in **55 Abs, 537,** the syllabi of which, although drawn by that Digest, this court approves, and which syllabi are as follows:

(1) "A labor union has the right to picket peacefully the place of business of an employer providing there exists a lawful labor dispute between the union and the employer and providing the union does so in a manner **which honestly and truthfully has for its purpose the informing of the public as to the dispute.**

(2) "Where an employer has, for many years, owned and operated **a union barber shop** in strict compliance with all reasonable and lawful provisions of the employees' union, that union cannot later require, under the terms of a new constitution and by-laws, that such employer become a nonparticipating member of the employees' union to the exclusion of all others and under the compulsion that a refusal to do so would result in the loss of his union shop card and the resignation of his union employees." (Emphasis by the court.)

See also Court's Conclusions beginning on page 543.

The Ninth District Court of Appeals affirmed this court. The Supreme Court of Ohio, in **155 Oh St, 573**, reversed both lower courts, and held:

Syllabus (2) "The display of a union shop card is a representation to the public that the party displaying it is recommended by and has the approval of the union issuing such shop card.

Syllabus (3) "If such party is not so recommended, and does not have that approval, that representation is false and will necessarily tend to deceive the public.

(4) "A court of equity will not enjoin the removal of a union shop card where the party displaying it has no contractual right to continue its display and is no longer either recommended or approved by the union."

In its majority opinion the Supreme Court of Ohio found, on page 579 (near bottom) "No picketing or threatened picketing is involved in the instant case."

May I say that although no actual picketing had occurred, and no threat to picket was made actually, the union strongly contended through its witnesses and through counsel that it had the lawful right to picket.

To this effect see Judge Middleton's dissenting opinion concurred in by the Chief Justice, where he found: (bottom page 587) "* * * and picketing—if union elects to exercise its asserted right to do so."

In 1941 in Milk Drivers Union of Chicago v. Meadowmoor Dairies Inc., 312 U. S., 287, the Supreme Court held:

Syllabus:

(1) "A State is at liberty under the Fourteenth Amendment to use injunctive powers vested in its courts for the prevention of violence by labor unions in industrial disputes.

(2) "And where the controversy is attended by peaceful picketing and by acts of violence, and the violence has been such that continuation of the picketing will operate coercively by exicting fear that violence will be resumed, an injunction by a state court forbidding the picketing as well as the violence does not infringe the Fourteenth Amendment."

The court said on page 294:

"The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful."

Further the court held in Syllabus No. 5:

"The present decision does not bar resort to the state court

for a modification of the injunction should that court find that the passage of time has deprived the picketing of its coercive influence."

In other words, at that time peaceful picketing could again be resumed.

In the same case Justice Reed, dissenting, said in part at page 320:

"This nation relies upon public discussion as one of the indispensable means to attain correct solutions of problems of social welfare. Curtailment of free speech limits this open discussion. Our whole history teaches that adjustment of social relations through reason is possible while free speech is maintained. * * * Free speech may be absolutely prohibited only under the most pressing national emergencies. * * *."

312 U. S. 321, A. F. of L. v. Swing (1941)

Syllabus:

"The Constitutional guaranty of freedom of discussion is infringed by the common law policy of a State limiting peaceful picketing by labor unions to cases in which the controversy is between the employer and his employees."

On page 326 the court said:

"The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

The union sought unsuccessfully to unionize a non-union beauty-parlor business. Picketing of the shop followed. The court held peaceful picketing permissible. There was some claim or question of violence, and so forth, but for the purpose of the decision, the court said that the state of the record made it necessary to disregard the question of violence.

In the case of Crosby v. Rath, et al, 136 Oh St, 352, the Ohio Supreme Court enjoined all picketing, even peaceful picketing, on the grounds that there was no legitimate trade dispute. This case was decided in January, 1940.

It will be noted that the union here sought to unionize the restaurant involved, and that none of the employees belonged to any union, nor was there any dispute between the employer and employees. Furthermore, there was extreme violence before the temporary injunction was issued by the trial court. The slashing of patrons' automobile tires, assaulting of employees and customers, throwing of stench bombs, and dynamiting of the employer's former residence, and other acts of violence occurred.

In my opinion, under the opinion of the Supreme Court of the United States, in the case of A. F. of L. v. Swing, 312

U. S. 321, February 10th, 1941, discussed herein, there was a legitimate trade dispute, but even so, if the Supreme Court of the United States had let it in, and had decided it, peaceful picketing would not have been allowed, because the United States Supreme Court held (Feb. 10, 1941) in the Milk Drivers Union v. Dairies, etc., 312 U. S. 287, that where the violence is of such magnitude originally that continuation of peaceful picketing will operate coercively, by exciting fear that the former violence will, be resumed, then all picketing will be enjoined.

It will be noted that the Ohio Supreme Court decision was in January, 1940, while the other two United States Supreme Court cases were decided February 10, 1941.

It will also be noted that the majority opinion makes no mention of the free speech doctrine laid down by the United States Supreme Court in the Swing and Milk Drivers cases. However, Judge Zimmerman in his dissenting opinion does recognize it and discusses it well and favorably as the law of the land.

Judge Myers, at page 356, concurring with the majority, pointed out that the union forfeited its right to peacefully picket by the extreme violence that occurred before the injunction against picketing. This ties in consistently with the Meadowmoor Dairies Inc. v. Milk Wagon Drivers Union discussed herein, where there was likewise extreme violence.

See also Judge Day's dissenting opinion, which upheld the right to peacefully picket.

From the very fine article of Clare Fahrer, senior student, Law School Cincinnati University, in Ohio Law Rep., May 31, 1948, citing many cases in re picketing, I quote:

"The United States Supreme Court denied certiorari of the Crosby case on the same day that the A. F. of L. v. Swing opinion was handed down. It may be that the existence of violence in the Crosby case was such that the court did not believe it was a proper link to fit in the chain of decisions on "picketing as free speech" * * *. Certainly the Ohio Supreme Court's opinion paid scant heed to any question of infringement on the right of free speech. At any rate the rule of the Swing decision has been considered to be broad enough to limit substantially if not completely to overthrow the authority of Crosby v. Rath."

**The defendants, the union and its business agent, cite the identical case of Howard J. Irwin, plaintiff-appellee, v. International Brotherhood of Electrical Workers, etc., Defendants-Appellant, Case No. 3398, recently decided by the Seventh District Court of Appeals of Ohio.**

The decision in full which I am informed was not appealed, is as follows:

"Plaintiff owns a tavern, situated in Youngstown, Mahoning County, Ohio, in which there was installed an automatic coin operated phonograph serviced by members of defendant-appellant, International Brotherhood of Electrical Workers of the American Federation of Labor.

"Plaintiff replaced that phonograph (which he did not own) by one (which likewise he did not own) not installed nor serviced by members of defendant union, from which he received a percentage of the income derived therefrom.

"Plaintiff refused to yield to the peaceful requests of representatives of defendant union to install a phonograph serviced by its members.

"Thereupon one of defendant members at a time peacefully walked to and fro in front of plaintiff's tavern carrying a manner containing the words 'the music box in this establishment is not serviced by a member of the I. B. E. W., Local 442-H, A. F. of L,' admittedly for the purpose of advertising 'the fact that the phonograph in plaintiff's establishment was not union serviced,' intended 'to persuade the public not to patronize' plaintiff's tavern, and with the result that certain suppliers of merchandise to plaintiff refrained from delivering same to such tavern.

"In the court of common pleas plaintiff sought an order permanently enjoining defendant union individually and its members collectively, from interfering with, bannering or picketing his tavern, or from interfering in any way with plaintiff, or any of his patrons. Upon hearing the trial judge found there was no labor dispute between employer and employee, and upon the evidence presented to him that it was unlawful for defendant union to picket plaintiff's tavern, and permanently enjoined it:—

"'1. From picketing, bannering, or patrolling the streets or sidewalks adjacent to, or in the vicinity of the plaintiff's place of business; from loitering or congregating at or near any entrance to plaintiff's place of business, or his residence, and from threatening to do so.

"'2. From in any manner preventing, interfering with, impeding, delaying, or stopping any deliveries to the plaintiff of any merchandise or supplies of any nature whatsoever.

"'3. From advising, protecting, aiding, or assisting any person or persons in the commission of the acts hereby restrained.'

"**Defendant appealed** from that order and judgment of the trial court on questions of law and fact, and the appeal was heard in this court de novo.

"While a member of the grievance committee of defendant union, who called at plaintiff's place of business, testified that he was sent there to settle a 'dispute,' we find no evidence of a dispute, labor or otherwise.

"On the contrary there was only a peaceable request concerning servicing of the music box installed in plaintiff's place of business, to which reference is made supra.

"Upon rejection of that request, one member at a time of defendant union carried a banner in front of plaintiff's place of business, worded as set forth above, which, as disclosed by the evidence, was a truthful statement. During more than one occasion of such 'picketing' a member of the grievance committee and another member of defendant union sat in an automobile parked across the street from plaintiff's place of business.

"Plaintiff's evidence discloses that 'there was no threat made' (sic), and no violence of any kind committed, no attempt to intimidate supplies of merchandise made, thus distinguishing this case from the case of Crosby, Appellant, v. Rath, et al, Appellees, 136 Ohio St., 352.

"Our decision is based entirely upon the Fourteenth Amendment to the Constitution of the United States, guaranteeing freedom of speech to all of its citizens, limited of course, to the right to speak the truth.

"Therefore it is the finding of this court that plaintiff has not established his right to the relief sought in his petition.

"The finding and decree of this court is for defendants, and plaintiff's petition is dismissed." (Emphasis by the court.)

## WAS THE DEFENDANTS' CONDUCT A SECONDARY BOYCOTT?

The Supreme Court of Ohio in the case of Anderson Sons Company v. Local Union No. 311 Teamsters, etc., decided February 13, 1952 (Ohio Bar February 18, 1952) and which will appear as 156 Oh St, 541, held the following in syllabi 1 and 2 in defining what is a secondary boycott:

"1. Workers may by means of peaceful and lawful picketing or bannering announce their grievances to the public and thus persuade or seek to persuade prospective employees as well as prospective customers of the person against whom the picketing or bannering is directed from dealing with such a person.

"2. A boycott may be defined in general terms as a concerted refrainment from business relations with another, or a concerted persuasion of third persons outside the combination to so refrain. It may be primary where there is a concerted refrainment from business relations with another, or by peace-

ful means a concerted inducement of others outside the combination to so refrain; or it may be secondary where there is not merely a concerted refrainment from business relations with the person against whom the boycott is directed or by peaceful means a concerted inducement of others outside the combination to so refrain, but an exercise of economic pressure upon such others to cause them to refrain from business relations with the person against whom the boycott is directed, through fear of loss or damage to themselves if they refuse to do so."

This case cites many authorities of interest to counsel. I will not attempt to discuss the facts or law cited fully.

I rather agree with Judge Zimmerman in his dissenting opinion at page 565, where he says: "The term 'secondary boycott' is elusive of any concrete definition."

However I do not find any similarity between the facts in the instant case and the Anderson case above. Our facts do not fall within the definition in the syllabus or that from **24 O. Jur., 676, Section 61,** cited by the court on page 563 of the Anderson case, with approval, as follows:

"A secondary boycott is a combination **not merely** to refrain from dealing with a person, or to advise, or by peaceful means persuade, his customers to refrain from dealing with him, **but** to exercise coercive persuasion upon such customers, actually causing them to withhold or withdraw their patronage from him through fear of loss or damage to themselves * * *." (Emphasis by the court.)

The plaintiffs operating the restaurant and bar are financially interested with Haradakis, the juke box owner, sharing in the gross take therefrom in a substantial way.

For all practical purposes they are all engaged in a joint enterprise as to said music box under the ruling of our Supreme Court in **Bennett v. The Sinclair Refining Company, 144 Oh St 139.**

The instant case does not involve any unlawful combination in restraint of trade or secondary boycott. It does not involve interstate commerce, so the so called Taft-Hartley Act is not applicable.

By means of peaceful picketing or bannering, through the press, via radio and the like, unions may acquaint the public under the doctrine of freedom of speech, under the Constitution, with their grievance, and this is true even though incidental hardship and damage may result.

Likewise the plaintiffs here, by banners or otherwise, may acquaint the public with the fact that they have no dispute with their union waiters, etc., and as to what the real dis-

pute is, so the Teamsters Union members will know that it is not a teamsters strike or picket line, and that its waiters, etc. are not on strike, and that no strike is going on.   _‘

It is obvious that the Fifth District Court of Appeals did not consider its case, which was practically identical, as a secondary boycott, but decided that case solely on the right of freedom of speech.

## CONCLUSION OF THE COURT

Under the facts and the law, the court concludes that this is not a case of secondary boycott.

Under the facts and the law there is in the court's opinion a labor dispute, and even if that is not technically true under the authority of the case of the Fifth District Court of Appeals set forth fully herein, the defendants under the freedom of speech theory would have the right to peacefully picket the plaintiffs' place of business so long as what is represented to the public by word of mouth or banners carried is the truth.

There has been no force or violence or threats, and no such conduct will of course be permitted.

Patrons, employees, tradesmen, truckers and the like are not to be prevented from going to and from the place of business, although they may be peacefully acquainted with the dispute.

The signs carried, or word of mouth representations, shall speak the truth, to-wit, "that the music box therein is not serviced by union labor." Nor shall the banners or oral representations attempt by larger print or otherwise to leave the false impression that it is a teamsters picket line. The present type banners in evidence, by photographs, are improper and cannot be used, because they do create that impression.

Some union members of the teamsters union, upon contacting their union, refused to cross the picket line, which was their privilege. That may have been due in part to a mistaken feeling that the teamsters union was really involved. However at the trial several union teamsters did testify for plaintiffs as to what occurred when they appeared to deliver goods.

The court finds that one picket at a time is reasonable and sufficient. No more will be permitted at one time. This does not mean that any union officer can also be on the scene.

Outside of the Youngstown case cited here, in full, this matter is new as far as the court can find, except as to the general labor law cases cited. In view of this fact, it is not beyond the realm of possibility that counsel may be able to work out some reasonable truce while the case is going through the courts, without prejudice to any rights the parties may have as the case is finally determined.

The petition of the plaintiffs is dismissed in so far as the injunction is concerned against peaceful picketing, which is allowed under the regulations the court has laid down.

Exceptions to the plaintiffs and defendants both.

Journal entry may be prepared along the lines indicated. Costs are taxed against plaintiffs.