**BELL v. ROGERS et.**

Common Pleas Court, Summit County.

No. 184846. Decided June 7, 1952.

Bruce W. Bierce, Edward N. Heiser, Akron, for plaintiff.
Louis S. Belkin, Akron, for defendants.

## OPINION
By WATTERS, J.
Conclusions of Fact and Law.

Plaintiff, Peter J. Bell, has been in the beauty shop supply business for a number of years.

Early this year his truck driver and four of his salesmen who called on the beauty operators of Summit, Lorain, Wayne, Medina and Stark Counties, signed up with and joined the defendant Union, of which James Rogers is the business agent. A competitor of Bell known as the K. and J. Beauty Supply had already unionized some time before that.

The four salesmen who signed up were Reese, Cox, Weeks and Jackson, and the truck driver or delivery boy Urich.

In addition, the employees were salesmen Humbert and Kile, a stockroom and handy man Richert, and I believe two office girls, a Mrs. Woofter and Mrs. Sullivan.

Bell was requested to negotiate a contract, but nothing came of it, and the five members named above voted to strike, and picketing started March 14 or 15, 1952. Four of the members became active as pickets and otherwise for the union, along with Rogers, while Jackson continued to work for Bell along with the employees loyal to Bell. This caused considerable bitterness naturally between the two groups or factions.

The plaintiff's business is conducted in a one story building at 93 N. Main Street, about sixty feet wide and one hundred twenty feet in depth. The rear is upon Maiden Lane Alley (public) about twenty feet wide.

The picketing continued through the day and night, twenty-four hours, at the place of business. The reason for this does not clearly appear, except it appears that the Bell group have in some instances worked late at night getting orders ready. It would have been more sensible if they had by agreement worked a reasonable day and the pickets likewise.

During the day there were usually two pickets of the four mentioned on at one time in front, with Rogers actively looking in on the situation from time to time.

Bell has delivered most of his orders since picketing started through the mail. However many customers came to the store to purchase supplies during day-time working hours. With such persons the pickets, who knew most of the customers, discussed the dispute, but there were no threats of violence or intimidation and no violence.

Many customers were told that if they continued to purchase from Bell, their places of business (beauty shops) would be picketed.

Many customers were called upon by Rogers and others of the four and told that if they purchased from Bell, or did not return purchases made of him, their beauty shops would be picketed.

In only one instance did such picketing actually occur at a beauty shop for several hours only, when it was discontinued.

Some customers were followed to their place of business where they were told to stop buying of Bell, or to return their purchase, or their place would be picketed. This phase of the case is discussed under the law findings later.

On one occasion there was some jostling of one Don Houlton,

son of one of the lady employees, by two of the pickets in front, near the door, after words and some name calling was exchanged by him and them. The two pickets have been charged with assault and battery in Municipal Court and are awaiting trial. Therefore I will not discuss it in any degree, or the merits thereof. Civilly it was of course not permissible under any right of peaceful picketing, but was an isolated flare-up of no great seriousness.

There was some spotty evidence about pickets parking their cars in the public alley back of the building in the vicinity of Bell's back door. To clear up that situation no picket car may be parked or operated by a picket or on his behalf in any such manner as to interfere with the loading or unloading, or ingress or egress of any car or truck entering or leaving said alley on business with Bell, or the driver of said car or truck.

The telephone wires come off a pole at a point about three feet over the roof. Said pole being at the rear of the building and almost flush with the rear wall. The wires extended toward Main Street (west) lengthwise of the roof and about three feet above it, and entered the building at the upper front wall just about eight feet up from the sidewalk at the upper southwest corner of the building. Anyone could easily climb the pole to the roof by means of the metal bar-steps placed alternately on the pole as commonly seen on telephone poles for climbing purposes.

The evidence shows that the two wires about two inches apart were cut, once right at the pole, then next in the center of the roof, and the last time, where they entered the front part of the front wall. There were three different cuttings at different intervals of time apart.

Plaintiff claimed that the defendants cut the wires. The defendants claimed that the plaintiff cut them.

The first cutting was repaired at midnight for Bell by a man procured by one Craig Martin, who he named as a Williard J. Morris, but Morris did not appear here as a witness. Martin told a wierd and mysterious tale which I will not attempt to repeat here.

The next time Bell himself repaired them from the roof, or he may have repaired them the first time—it is immaterial which. The third time the telephone company repaired them after they had been cut some four or five weeks. In the meantime the evidence showed that Bell used the phone in the business place next door.

The court cannot determine from the mere fact that the phone wires were cut, who cut them. The union telephone

repair men of course refused to cross the picket line, which is their custom, and apparently the telephone company can't do anything about it without the agreement of its union officers.

However the decree shall contain an order of this court binding upon the defendants and the defendant union to withdraw its picket line if phone service is interrupted at Bell's through cutting of the wires by unknown persons or known persons, or any other cause, for a period of time necessary to repair its service, said time of withdrawal to be fixed by counsel, and in case of inability of counsel to agree on the time, the court will set it, at the convenience of the telephone company.

At one or two times during the picketing Bell posted a sign on the inside of his window in front reading in substance "Open for Business," the pickets placed a sign or signs over it reading in substance "Closed for Business." This occurrence or occurrences was or were not permissible under the free speech doctrine, as he was open for business, and the pickets' signs **were false.** Although those occurrences were early in the picketing, they were improper and the court enjoins such proceedings.

The evidence shows the following of salesmen's and other employees' cars by pickets and Rogers, in their cars, at a hazardous and dangerous distance between cars.

The defendants no doubt have the lawful right to follow salesmen and customers at a safe distance behind so as to ascertain their customers for the purpose of acquainting those persons with the dispute in a lawful manner. But they have no lawful right to harass said salesmen or customers by trailing them in a dangerous and hazardous manner, causing them in some instances to pull over and stop, and thus limiting their freedom of movement. Such conduct is infantile, dangerous, unlawful and by no stretch of the imagination can be considered in the exercise of freedom of speech, and is enjoined.

Mr. Rogers, the defendant union's business agent, freely admitted that he and the pickets under his instructions, had told practically all the customers, beauty shop proprietors, that if they continued to trade with Bell, or did not return purchases they had made, the union would picket their place of business. Apparently he did this under advice of counsel, who contends that defendant had that right.

This court does not agree. The defendant union would have no authority to picket the beauty shops to compel them to unionize, because the union has no such beauty-parlor employees jurisdiction and coverage. Mr. Rogers admitted that

they would not picket for that purpose, but only for the purpose of influencing them not to trade with Bell, or to take back what they had bought.

In the court's opinion, to picket the beauty shop for such purpose would not be primary picketing at the situs of the dispute, hence lawful, but would be a secondary boycott and unlawful, although in itself peaceful.

It is true that they only threatened to picket such customers, except in one instance where they did picket for awhile, but they did it believing they had that right, and conveyed the idea to the customers that they would be picketed if they should trade with Bell.

In my opinion such conduct constitutes an unlawful secondary boycott and is enjoined.

See **Anderson Sons Co. v. Local Union No. 311, 156 Oh St 541,** 104 N. E. 2d 22, 24, cited and discussed further hereinafter. In the second syllabus thereof will be noticed the following words: "but an exercise of economic pressure upon such others to cause them to refrain from business relations with the person against whom the boycott is directed, through fear of loss or damage to themselves if they refuse to do so."

Applied to our case, the conduct in said respect against the customers as found herein constituted a secondary boycott. The defendants cannot picket such customers. Nor can they threaten to do so if they trade with Bell. Such conduct is enjoined.

Further Conclusions of Law and Fact.

In the court's opinion the facts in this case show a labor dispute in existence beyond any doubt, and peaceful picketing is permissible under the Freedom of Speech Doctrine. See A. F. or L. v. Swing, 1941, 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855.

Also see this court's opinion in Iacomini's Restaurant v. Hotel and Restaurant, etc., Union No. 118, 85 N. E. 2d 534, 54 Abs 33, which latter case was affirmed by our Court of Appeals, **63 Abs 258.**

In 1941 the United States Supreme Court held in substance in Milk Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, that:

"Where the violence is of such magnitude originally that continuation of peaceful picketing will operate coercively, by exciting fear that the former violence will be resumed, then all picketing (even peaceful) will be enjoined."

See also **Anderson Sons Co. v. Local Union No. 311, etc., 156 Oh St 541,** 104 N. E. 2d 22, Syllabus (1)—(Ohio Bar Feb. 18, 1952) as follows:

"Workers may by means of peaceful and lawful picketing or bannering announce their grievances to the public and thus persuade or seek to persuade prospective employees as well as prospective customers of the person against whom the picketing or bannering is directed from dealing with such person."

The case of Crosby v. Rath, 136 Oh St 352, 25 N. E. 2d 934, cited in the above case is fully discussed in this court's decision in the Iacomini case cited above. Briefly in the Crosby case the violence was so extreme that the Ohio Supreme Court enjoined all picketing, and the United States Supreme Court refused to admit the case apparently on authority of the principle at that time decided by the United States Supreme Court in Milk Wagon Drivers Union v. Meadowmoor Dairies cited herein above.

However in the instant case, whatever violence there was, was comparatively of slight magnitude, so the court cannot and does not enjoin, but permits, peaceful picketing with the limitations set forth hereinafter.

### Peaceful Picketing.

Peaceful picketing is allowed under the constitutional guaranty of freedom of speech, in order that the union may acquaint the public with the fact that a labor dispute is on, and of its nature.

Pickets have the lawful right to peacefully persuade prospective customers, truckers, employees and the public not to cross the picket line, and not to trade with or work for the employer picketed, and can fully inform everyone of the labor dispute peacefully and truthfully by bannering or otherwise. No picket, however, can use any form of violence, nor engage in any threats or intimidation of any nature whatsoever.

Anyone wishing to enter or leave the place of business can do so freely, whether he be a trucker, an employee who desires to work, a customer, or any one wishing to enter or leave the place.

Often other union employees such as truckers and the like will refuse to cross a picket line. That is their privilege, and nothing can be done about that.

Mass picketing or physical blocking of ingress and egress to the place being struck is not permissible.

The employer picketed may of course likewise orally, in writing, by bannering, through the press, via radio, letters, etc., give his side of the dispute to customers and the public generally.

The peaceful picketing allowed will be confined to the side-

walk in front of Bell's place and to the alley in the rear, and there will be only one picket in the front at one time, and only one in the rear at one time, and neither shall picket in any way so as to have (2) in the front or rear at any one time.

The other remaining pickets and Rogers will not "join up" either of the pickets actively engaged in picketing on the picket line in any manner so as to increase the number allowed at any one time, except for a reasonable time in which to change shifts.

The Court has already laid down above what is generally understood by lawful or peaceful picketing.

I firmly believe that if counsel and the parties could sit down together with open minds, in a give and take frame of mind, that some satisfactory proposition can be worked out. If I can aid counsel along this line, I shall be pleased to do so.

The entry will be drawn in accordance with the court's decision, with exceptions.

The costs are taxed against the defendant Union.