C. COMELLA, INC., APPELLEE, *v.* UNITED FARM WORKERS
ORGANIZING COMMITTEE ET AL., APPELLANTS.

[Cite as C. Comella, Inc., v. United Farm Workers
(1972), 33 Ohio App. 2d 61.]

(No. 31416—Decided December 14, 1972.)

*Mr. Robert T. Rosenfeld,* for appellee.
*Messrs. Rudd, Karl, Sheerer & Lybarger* and *Mr. John D. Campbell,* for appellants.

KRENZLER, J. This case involves a labor dispute, wherein the parties are C. Comella, Inc. (hereinafter referred to as "plaintiff" or "Comella"), a Cleveland wholesaler of produce whose place of business is at the Northern Ohio Food Terminal (hereinafter referred to as "NOFT"); United Farm Workers Organizing Committee (hereinafter referred to as "defendant" or "UFWOC"), a labor organization which is part of the AFL-CIO, and which represents California agricultural workers; also named as defendants were Mack Lyons and Diana Lyons, coordinators of UFWOC activity in the Cleveland area; other participants in the labor dispute but not parties to the action are Bud Antle, Inc., a California lettuce grower (hereinafter referred to as "Antle"); various retailers who are customers of Comella and who sell Antle produce; various other individuals representing UFWOC; and the Western Conference of Teamsters.

Antle would not recognize UFWOC as the bargaining agent for its agricultural workers in California and a labor dispute developed between UFWOC and Antle. UFWOC followed Antle's product (lettuce) to Cleveland to Comella's place of business at the NOFT and there engaged in various activities. UFWOC also followed Antle's product (lettuce) from Comella's place of business to various retailers who are customers of Comella and engaged in various activities there.

Comella brought an injunction action in the Common Pleas Court of Cuyahoga County, and the substance of its complaint is as follows.

Defendant union is seeking to force the plaintiff to cease buying lettuce from or handling the produce of Antle. The defendant, its officers, agents and members entered upon its premises at the NOFT and picketed said premises. The picketing has taken the form of numerous persons blocking the loading dock of plaintiff, blocking trucks that are hauling plaintiff's produce. Defendant has also interfered with plaintiff's business by harassing customers of plaintiff who purchase lettuce, harassing plaintiff by telephone calls, and trespassing upon plaintiff's property, as well as the property of the NOFT.

The substance of the defendants' answer was an admission that Comella is engaged in the business of selling wholesale fresh produce to grocery stores and purchases lettuce from Antle, and that the defendant is a labor union of farm workers. The defendants deny the balance of plaintiff's allegations.

The trial court issued a temporary restraining order against the defendants and enjoined them from interfering with plaintiff's business and interfering with ingress and egress from plaintiff's premises, congregating, loitering, assembling or picketing anywhere on the premises of the plaintiff or upon the premises of NOFT, harassing or interfering with plaintiff and its customers by telephone calls, letters or otherwise. Defendants were granted the right to picket, by no more than one person at any time at the East 40th Street entrance or gate to the NOFT.

A hearing was held for a permanent injunction and restraining order and the testimony of twenty-two witnesses was presented to the court. In addition, the following written stipulation was entered into by and between the parties:

The United Farm Workers Organizing Committee is engaged in a labor dispute with certain producers of lettuce in California and Arizona, including Bud Antle, Inc., claiming that UFWOC represents a majority of the agricultural employees of each of those producers.

On July 23, 1970, UFWOC asserted such representation and demanded recognition of certain of them, includ-

ing Bud Antle, Inc., for purposes of collective bargaining on behalf of their employees.

Those producers of whom the demand for recognition had been made declined to recognize UFWOC on the ground that they had executed contracts with the Western Conference of Teamsters providing for recognition of the Teamsters as collective bargaining agent on behalf of the producers' respective agricultural employees.

UFWOC is not able to obtain assistance under the National Labor Relations Act to establish either that an unfair labor practice has been committed by those producers, or that the UFWOC represents a majority of their employees, respectively, because agricultural employees are not covered by the Act. It therefore has initiated a boycott of the lettuce produced by those employers in order to apply economic pressure to induce recognition of UFWOC.

Following the hearing the trial court made these findings of fact:

(1) Northern Ohio Food Terminals, Inc., is the owner of 216,318 square feet of land containing buildings, with said buildings divided into units, and the units leased to businesses for use and occupancy for Produce Market Purposes.

(2) The area referred to above is used only for Wholesale Produce and is not generally open to the public.

(3) Plaintiff is the lessee of two units from Northern Ohio Food Terminals, Inc.

(4) At the rear of plaintiff's units there is a loading dock platform having a width of three feet and in the front of plaintiff's units there is a loading platform eight feet in width.

(5) In the first week of December, 1970, the defendants contacted the plaintiff and, after explaining their purpose and the background of their problem, requested the plaintiff to cease purchasing Bud Antle products.

(6) When plaintiff refused to cease purchasing and selling Bud Antle products, the defendants placed observers on the front platform of plaintiff's business and when these observers saw someone purchase Bud Antle lettuce they followed that person to his retail store.

(7) Prior to the issuance of the Temporary Restraining Order there would be as many as fifteen persons from defendants' organization in the Northern Ohio Food Terminal and as many as eight of those persons would be on the front platform of plaintiff's units at one time with a constant surveillance crew of four persons.

(8) The presence of even one person on the front platform for a continuous period during the busy hours of the morning would, due to the tremendous business activity and the limited space of eight feet in width, be an interference with plaintiff's business for it is virtually impossible to stay out of the way of trucks used to transport the produce on the front platform and these trucks would frequently have to wait until the observer moved from one location to another so that they could pass.

(9) Leaflets were passed out at the Northern Ohio Food Terminal, being defendants' Exhibit A and plaintiff's Exhibit 6.

(10) The defendants contacted the retail stores purchasing Bud Antle lettuce from the plaintiff, and asked those store operators not to buy from the plaintiff. Usually five members of the defendants' organization would go to a store to talk with the manager or owner.

(11) The defendants contacted some store operators as many as six times and they returned to those stores with the same requests even though they had previously been asked by the store operators not to return again.

(12) Defendants and their associates told the retail store operators they would be picketed if they continued to sell Bud Antle lettuce.

(13) Some of the plaintiff's retail store customers were picketed as a result of selling Bud Antle lettuce and the number of pickets was as high as fifteen. Pickets passed out leaflets, plaintiff's Exhibit 3, and carried signs some of which read, "PLEASE DON'T SHOP AT THIS STORE. UFWOC, AFL-CIO."

(14) During the picketing and on some of the numerous visits by defendants to the retail stores there was violence.

The Court also made the following conclusions of law:

(1) This case is not pre-empted by the National Labor Relations Act.

(2) Defendants' actions to stop the plaintiff and its customers from selling Bud Antle products is a secondary boycott and may be prohibited under Ohio law.

(3) The defendants' conduct in attempting to persuade others not to purchase any items from plaintiff is illegal conduct under the U. S. Supreme Court's view of secondary boycotts.

(4) The defendants' conduct in telling the members of the public not to shop at the retail stores of plaintiff's customers is an illegal type of secondary boycott under Federal laws.

(5) The movement of the defendant upon the premises of the Northern Ohio Food Terminal grounds may be enjoined on the basis that said grounds are not ordinarily open to the public.

(6) This is an action in equity and under Ohio law, and the new Ohio Rules of Procedure, adopted July 1, 1970, the Court should grant all appropriate relief for the facts pleaded in the complaint.

The Court then enjoined and restrained the defendants from committing, attempting to commit or causing to be committed, any of the following acts:

(1) Interfering with plaintiff's officers, agents, employees, representatives and others having business with the plaintiff;

(2) Interfering with ingress to, or egress from plaintiff's premises, or with vehicular traffic in or about said premises, including the delivery, unloading, loading and dispatching of produce to and from plaintiff's business;

(3) Congregating, loitering, assembling or picketing anywhere on the premises of plaintiff or on the premises of the Northern Ohio Food Terminal;

(4) Harrassing or interfering with the plaintiff and its customers by telephone calls, letters, or otherwise;

(5) Picketing of the plaintiff or any of its retail customers;

(6) Giving any speeches, distributing handbills, or in

any other manner advising the general public not to buy Bud Antle lettuce or other products from the named plaintiff, or mentioning the name of its customers in an effort to stop the general public from buying Bud Antle products from said customers.

The Court further added the provision that the injunction should not be construed as prohibiting the defendants from mailing notices to the general public, nor from passing out leaflets to the general public, as a means of expressing their thoughts about Bud Antle products, so long as those expressions are general in nature and do not mention plaintiff or its customers, and so long as such expressions are not generally aimed at the plaintiff or its customers or their business establishments.

Defendants have taken this appeal and list nine assignments of error as follows:

(1) The Trial Court erred in finding that the Northern Ohio Food Terminal is not open to the public and that the appellants therefore do not have a right of access to it for the exercise of First Amendment rights.

(2) The Trial Court erred in finding that there was interference by defendants with plaintiff's business.

(3) The Trial Court erred in finding that the defendants asked retail store operators not to buy from the plaintiff.

(4) The Trial Court erred in finding that defendant's conduct to persuade others not to purchase any item from retailers selling Antle lettuce is illegal conduct under the Federal law and the U. S. Supreme Court's view of secondary boycotts.

(5) The Trial Court erred in finding that the defendants' actions were illegal in requesting retail customers of stores selling Bud Antle lettuce not to patronize those stores although the actions consisting solely of peaceful communications to persons whom the defendants could not coerce.

(6) The Trial Court erred in excluding evidence of the refusal of Bud Antle, Inc., to recognize and negotiate with UFWOC as the representatives of the majority of

Bud Antle employees and in failing to regard such a refusal as justification for secondary boycotts otherwise illegal.

(7) The Trial Court erred in excluding from the Record Defendants' oral and written proffer of evidence that Bud Antle, Inc., refused to recognize and negotiate with UFWOC as the representatives of a majority of Bud Antle employees.

(8) The Trial Court erred in issuing an injunction so overbroad as to bar the defendants from advocating a consumer's boycott of Bud Antle lettuce at the premises of retail sellers of it.

(9) The Trial Court erred in enjoining defendants, its [sic] officers, agents and associates from committing any certain specified acts.

Defendants' nine assignments of error may be divided into four categories.

(1) Assignments of error one and two deal with the questions whether the defendants interfered with the plaintiff's business and whether the NOFT was open to the public to such an extent that the defendants have a right of access to it for the exercise of their rights under the First Amendment to the United States Constitution.

The record contains testimony which sufficiently establishes that the NOFT is occupied by produce wholesalers and is not open to the public generally. The testimony also shows that the loading platforms of plaintiff's premises at the NOFT are relatively small, that defendants stationed observers on these platforms, sometimes in groups, and that this caused congestion of plaintiff's premises and made operation of plaintiff's business difficult or impossible. The trial court therefore did not err in finding that the NOFT is not open to the public, and in finding that defendants interfered with plaintiff's business.

Defendants do not have a right of access to the NOFT for the purpose of picketing because it is not a place normally open to the public. A denial of such access does not violate a person's first amendment rights to freedom of speech. *Food Employees Local 590* v. *Logan Valley Plaza*

(1968), 391 U. S. 308; *Adderly* v. *Florida* (1966), 385 U. S. 39. It is noted that the trial court's injunction does not prohibit picketing in the public areas surrounding the NOFT.

Findings of fact 1 through 9 relating to the defendants' activities at the NOFT are supported by the record; conclusions of law 2, 3 and 5 are correct statements of the law applicable to these facts; and the court properly enjoined defendant from committing the acts listed in items 1, 2, 3, 4 and that part of 5 applicable to plaintiff.

(2) Assignments of error three, four and five are concerned with defendants' actions relating to the plaintiff's customers who are retail store operators and whether these actions were an illegal secondary boycott or part of a lawful primary labor dispute between Antle and UFWOC.

Assignments of error three, four and five are not well taken. There was testimony before the trial court that numerous members of defendant organization contacted retail stores who purchased Antle lettuce from plaintiff, and on repeated occasions requested those stores not to buy Antle lettuce; that defendants warned the retail stores they would be picketed if they continued to buy Antle lettuce; and that defendants did in fact picket the retail stores, and passed out leaflets requesting retail customers not to shop at those stores. Findings of fact 10 through 14 thus have support in the record. The trial court also correctly stated in its conclusions of law 2, 3 and 4 that defendants' activity was a secondary boycott, which is prohibited under both Federal and state law. Section 158 (b) (4), Title 29, U. S. Code; *Local 761, Electrical Workers* v. *NLRB* (1961), 366 U. S. 667; *International Bhd. of Electrical Workers* v. *NLRB* (1951), 341 U. S. 694; *W. E. Anderson Sons Co.* v. *Local 311, Teamsters* (1952), 156 Ohio St. 541; *Ridge Mfg. Co.* v. *Electrical Workers Local 735* (1947), 36 Ohio Op. 206, 77 N. E. 2d 248.

There will be additional discussion concerning secondary boycotts later in this opinion.

(3) Assignments of error six and seven deal with

the refusal of the trial court to admit into evidence or receive the defendants' proffer of evidence regarding the refusal of Antle to recognize and negotiate with UFWOC as a reprensentative of the majority of Antle employees.

Assignments of error six and seven are not well taken. These assignments of error deal with the refusal of Antle (the primary employer) to negotiate and enter into a labor agreement with UFWOC, whose members work for Antle. Inasmuch as both Antle and its employees are located in California, this court does not have jurisdiction of those issues.

Further, the trial court refused to accept defendants' proffer, but it is included as part of the record on this appeal. We have reviewed defendants' proffer, and the material contained therein is not material or relevant to the issues in this case. We cannot say that the trial court erred in not admitting the proffer. In addition, the trial court's refusal to admit the defendants' proffer does not prejudice defendants in this case.

Appellants also seek to have this court rule on the validity of a contract between Antle and the Western Conference of Teamsters as the representative of Antle's field workers. We do not have jurisdiction to decide that issue because the parties to the contract, namely, Antle and the Western Conference of Teamsters, are not before this court. The only issues to be decided in this case are those presented by the complaint of the plaintiff in the trial court and the errors assigned by the appellant in this appeal. The validity of the contract is not an issue in this case.

(4) Assignments of error eight and nine attack the trial court's injunction as being overbroad in that it does not allow a consumer boycott of Antle lettuce at the retail stores of customers of Comella.

As stated above, the trial court's injunction, items 1 through 4, and part of 5, which restrains the defendants from the activities enumerated therein, is valid. However, the balance of the trial court's injunction, as it relates to items 5 and 6, will require further discussion.

The remaining portion of this opinion will be devoted to a discussion of the subject of consumer boycotts at secondary sites, which the defendants claim should be legal under Ohio law.

Generally, issues involving unfair labor practices are brought before the National Labor Relations Board and Federal courts because the Federal government has preempted this area of labor law. Section 158, Title 29, U. S. Code. *Motor Coach Employees, Div. 998,* v. *Employment Relations Bd.* (1951), 340 U. S. 383. However, this case is in a state court because it involves agricultural workers who are exempt from the provisions of the National Labor Relations Act. Section 152 (3), Title 29, U. S. Code. Also see, *Bldg. Trades Council* v. *Garmon* (1959), 359 U. S. 236; *United Farm Workers Org. Comm.* v. *Superior Court* (1971), 4 Cal. 3d 556, 483 P. 2d 1215.

Labor law has developed in the United States through many stages, including common law decisions; Sherman and Clayton Antitrust Acts (1890 and 1914); Railway Labor Act (1926); Norris-Laguardia Act (1932); Wagner Act—1935 (the National Labor Relations Act); Taft-Hartley Act—1947 (amending the National Labor Relations Act); Landrum-Griffin Act (1959).

The national policy established by the Congress was that the status of labor must be improved as to working conditions and pay, and that the activities of the workers in organizing and unionizing to accomplish these objectives must be protected. Legislation was enacted to protect the rights of both employers and employees in the field of collective bargaining and this legislation spells out the rights, obligations and responsibilities of employers, employees and unions.

The constitutionality of the National Labor Relations Act has been upheld. *Consolidated Edison Co.* v. *NLRB* (1938), 305 U. S. 197; *NLRB* v. *Jones & Laughlin Steel Corp.* (1937), 301 U. S. 1.

Some states have enacted legislation similar to the National Labor Relations Act which controls labor disputes in which the National Labor Relations Act is not ap-

plicable. Ohio has not enacted such legislation; therefore, common law and case decision will control when the National Labor Relations Act is not applicable.

Labor law has a terminology all its own, and in order for those not knowledgeable in the field of labor law to fully understand this case it will require an explanation of some basic labor terms such as the following:

*Boycott* Refusal to work for, purchase from or handle the products of an employer.

*Picketing* The presence at an employer's business by one or more employees and/or other persons to publicize a labor dispute, influence employees or customers to withhold their work or business, respectively, or show the union's desire to represent the employees. This is usually accompanied by patrolling with signs.

*Mass Picketing* Concentrations of large numbers of employees (pickets) at entrances to a plant or business making it difficult or impossible for anyone to enter or leave.

*Primary Activity* Action such as a strike or picketing directed against the employer with whom there is a labor dispute.

*Primary Employer* The employer with whom the union has a labor dispute.

*Secondary Employer* A neutral person or business who has no labor dispute with a union, or one who cannot or will not take the action which the union wants to accomplish its objective.

*Secondary Activity* Actions such as a strike or picketing against a secondary or neutral employer with an object of forcing this employer to stop doing business with the primary employer.

*Secondary Boycott* Refusal to work for, purchase from or handle products of a secondary employer with whom the union has no dispute with an object of forcing that employer to stop doing business with the primary employer with whom the union has a dispute.

*Strike* A concerted refusal of employees to perform work which they have been assigned,

Labor's weapons in industrial and commercial struggles are the strike, picketing, boycott and other similar activities. However, these activities must be peaceful and carried on without violence. Peaceful picketing is protected by the constitutional guarantee of freedom of speech under the First and Fourteenth Amendments to the United States Constitution and Section 11, Article I, Ohio Constitution. *Teamsters Local 695* v. *Vogt, Inc.* (1957), 354 U. S. 284; *Thornhill* v. *Alabama* (1940), 310 U. S. 88; *Carlson* v. *California* (1940), 310 U. S. 106; *Senn* v. *Tile Layers Union* (1937), 301 U. S. 468.

These activities are permissible in order that a union may acquaint the public with the fact that a labor dispute exists, and the nature of such dispute. *Bell* v. *Rogers* (1952), 63 Ohio Law Abs. 385, 107 N. E. 2d 136; *Nicholson* v. *Vending Machine Service Employees* (1952), 63 Ohio Law Abs. 19, 104 N. E. 2d 473.

As noted above, if there is a dispute between a primary employer and his employees and/or union, peaceful strikes, picketing and boycotting directed against the employer are legal and permitted. Sections 157, 158 (b)(4), Title 29, U. S. Code; *Div. 1287, Motor Coach Employees* v. *Missouri* (1963), 374 U. S. 74; *Motor Coach Employees, Div. 998*, v. *Wisconsin Employment Relations Bd., supra; NLRB* v. *Jones & Laughlin Steel Corp., supra.* Such activity may be undertaken at the employer's site.

However, a question is presented as to how far the area of activity of the union in striking, picketing and boycotting will be permitted to expand beyond the primary employer's site of business.

If a union expands its activity by following the product of the primary employer to a secondary source such as a wholesaler, distributor or retailer doing business with the primary employer, and the union conducts a strike against or boycotts or pickets a secondary employer, this may or may not be legal, depending on the type of activity and the jurisdiction of the dispute, whether Federal or state.

Secondary activities may take several forms, includ-

ing strikes by secondary employees, refusal to handle non-union merchandise carried by secondary employers, picketing, solicitation, boycotting of the secondary employer generally or boycotting of only the nonunion product. There also may be pickets with signs and handbills, telephone calls and personal calls, letters, advertisements in newspapers, radio and television.

Whenever the union activity expands beyond the two primary participants such as the employer and the employees and/or union, we get into an area of secondary activity which may lead to either an illegal secondary boycott or a legal product boycott, or secondary consumer boycott, which will be discussed hereafter.

A secondary boycott is union pressure directed at a neutral employer or secondary employer to induce or coerce him to cease doing business with a primary employer with whom the union is engaged in a labor dispute. *National Woodwork Mfrs. Assn.* v. *NLRB* (1967), 386 U. S. 612; *rehearing denied* in 387 U. S. 926; *Local 761, Electrical Workers* v. *NLRB, supra; Duplex Printing Press Co.* v. *Deering* (1921), 254 U. S. 443.

A secondary boycott has been declared illegal by the Congress of the United States, Section 158 (b)(4), Title 29, U. S. Code; and this legislation has been held constitutional. *International Bhd. of Electrical Workers* v. *NLRB, supra.* The theory of enacting such legislation is that a secondary employer who is neutral or innocent should not suffer because he is not part of the primary labor dispute. *National Woodwork Mfrs. Assn.* v. *NLRB, supra; Typographical Union* v. *NLRB* (D. C. Cir. 1968), 401 F. 2d 952; *NLRB* v. *Bldg. Service Employees Local 105* (10th Cir. 1966), 367 F. 2d 227; *NLRB* v. *Local 25, Electrical Workers* (2nd Cir. 1965), 351 F. 2d 593.

State courts have declared secondary boycotts illegal, either upon the ground that they constitute unlawful coercion or upon the broad principle that one not a party to an industrial dispute cannot, against his will, be made an ally of one of the parties. The common law rule in a majority of states is that a secondary boycott is unlawful

and may be enjoined. Secondary boycotts have been held illegal in Ohio. *W. E. Anderson Sons Co.* v. *Local 311, Teamsters, supra; Ridge Mfg. Co.* v. *Electrical Workers Local 735, supra.*

However, Congress has not outlawed every type of secondary activity and the line between legitimate primary activity and banned secondary activity is not absolutely clear. *International Bhd. of Electrical Workers* v. *NLRB, supra; Bhd. of Railroad Trainmen* v. *Terminal Co.* (1969), 394 U. S. 369.

While Section 158 (b)(4), Title 29, U. S. Code, makes a secondary boycott an unfair labor practice and unlawful, it is not intended that this section interfere with lawful primary activity, Section 158 (b)(4), Title 29, U. S. Code. *NLRB* v. *International Rice Milling Co.* (1951), 341 U. S. 665.

It must be determined how far the courts will go in protecting the rights of a neutral secondary employer and his right not to be intimidated and harassed, where he does not have a labor dispute of his own. These rights must be balanced with the right of the union and employees to express their grievances against the primary employer and to advise the public concerning these grievances.

It has been held that the union in the primary labor dispute may follow the product of the primary employer and let the public know in a peaceful manner that there is a dispute between the primary employer and the union. This has been allowed in cases where there is a unity of interest between the primary employer and the product and its sale to the secondary employer. Under such facts, what may be called "product picketing" is considered to be a part of the primary labor dispute and therefore valid, the theory being that the activity is directed against the product and therefore against the primary employer, and not against the secondary employer. Some courts have even held that a secondary employer is not really neutral or innocent because when he carries certain non-union products he is getting the benefits of the lower wages and prices paid by the primary employer and therefore, there

is a unity of interest between the primary and secondary employer, and picketing and boycotting at the secondary employer's establishment should be permitted. *Netherton v. Davis* (1962), 234 Ark. 936, 355 S. W. 2d 609; *Milwaukee Boston Store Co. v. Hosiery Workers, Branch 16* (1955), 269 Wis. 338, 69 N. W. 2d 762; *Galler v. Slurzberg* (1953), 27 N. J. Super. 139, 99 A. 2d 164; *Ohio Valley Advertising Corp. v. Sign Painters Local 207* (1953), 138 W. Va. 355, 76 S. E. 2d 113; *Johnson v. Milk Drivers Local 854* (La. App. 1940), 195 So. 791; *Fortenbury v. Superior Court* (1940), 16 Cal. 2d 405, 106 P. 2d 411; *Goldfinger v. Feintuch* (1937), 276 N. Y. 281, 11 N. E. 2d 910.

State courts thus recognized the distinction between picketing a secondary employer merely to follow the struck goods and picketing designed to result in a generalized loss of patronage. This same distinction was recognized by the United States Supreme Court in *NLRB v. Fruit and Vegetable Packers Local 760* (1964), 377 U. S. 58, hereinafter referred to as the *Tree Fruits* case.

Because of the importance of *Tree Fruits*, it is necessary to look at the facts and the activities of the union in that case.

In *Tree Fruits* the union called a strike against fruit packers and warehousemen doing business in Yakima, Washington. The struck firms sold Washington State apples to the Safeway chain of retail stores in and about Seattle, Washington. The union instituted a consumer boycott against the apples in support of the strike and placed pickets to walk back and forth before the customers' entrance at 46 Safeway stores in Seattle.

The pickets at each of the stores wore placards and distributed handbills, which appealed to the customers and to the public generally to refrain from buying Washington State apples, which were one of numerous food products sold in the stores. The information contained on the placard and worn by each picket stated:

"To the Consumer: Non-Union Washington State apples are being sold at this store. Please do not purchase such apples. Thank you. Teamsters Local 760, Yakima, Washington."

A typical handbill read:
"DON'T BUY WASHINGTON STATE APPLES
The 1960 Crop of Washington State Apples is Being
Packed by Non-Union Firms
Included in this non-union operation are twenty-six firms in the Yakima Valley with which there is a labor dispute. These firms are charged with being
UNFAIR
by their employees who, with their union, are on strike and have been *replaced by non-union strike-breaking workers* employed under substandard wage scales and working conditions.

In justice to these striking union workers who are attempting to protect their living standards and their right to engage in good-faith collective bargaining, we request that you
DON'T BUY
WASHINGTON STATE
APPLES
Teamsters Union Local 760
Yakima, Washington
This is not a strike against any
store or market.
(P. S.—PACIFIC FRUIT & PRODUCE CO. is the only firm packing Washington State Apples under a union contract.)"

Before the pickets appeared at any store a letter was delivered to the store manager informing him that the picketing was only an appeal to his customers not to buy Washington State apples and that pickets were being expressly instructed to patrol peacefully in front of the consumer entrances of the store, to stay away from the delivery entrances, and not to interfere with the work of employees or with deliveries to or pickups from the store.

A copy of written instructions to the pickets, which included the explicit statement "* * * you are also forbidden to request that the customers not patronize the store * * *" was enclosed in the letter. Since it was desired to assure Safeway employees that they were not to cease work, and to avoid any interference with pickups or de-

liveries, the pickets appeared after the stores opened for business and departed before the stores closed. At all times during the picketing the store employees continued to work and no deliveries or pickups were obstructed. Washington State apples were handled in normal course by the employees of the store. Ingress and egress by customers and others was not interfered with in any manner.

A complaint that the foregoing conduct violated Section 158(b)(4), Title 29, U. S. Code, was issued and the case was submitted directly to the NLRB.

The NLRB held that consumer picketing in front of a secondary establishment is prohibited. Upon review the Court of Appeals for the District of Columbia rejected the Board's construction and held that the statutory requirements of showing that the union's conduct would threaten, coerce or restrain Safeway could only be satisfied by affirmative proof that a substantial economic impact on Safeway had occurred or was likely to occur as a result of the conduct.

The Supreme Court granted certiorari, and upon review, held that peaceful consumer picketing by a union at a secondary site which is limited to persuading consumers not to buy the primary employer's product is not an unfair labor practice.

The Supreme Court of the United States stated that Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable. The Court recognized this Congressional practice not to outlaw peaceful picketing unless there is the clearest indication in the legislative history that Congress intended to prohibit the activity.

We now quote directly from the opinion:

"Under Section 8(b)(4)(ii)(B) of the National Labor Relations Act, as amended, it is an unfair labor practice for a union 'to threaten, coerce, or restrain any person,' with the object of 'forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer . . . or to cease do-

ing business with any other person. . . .' A proviso excepts, however, 'publicity, *other than picketing*, for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.' (Italics supplied.) The question in this case is whether the respondent unions violated this section when they limited their secondary picketing of retail stores to an appeal to the customers of the stores not to buy the products of certain firms against which one of the respondents was on strike." 377 U. S. 58, 59.

"We have examined the legislative history of the amendments to Section 8(b)(4), and conclude that it does not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites, and, particularly, any concern with peaceful picketing when it is limited, as here, to persuading Safeway customers not to buy Washington State apples when they traded in the Safeway stores. All that the legislative history shows in the way of an 'isolated evil' believed to require proscription of peaceful consumer picketing at secondary sites, was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes

beyond the goods of the primary employer and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute." 377 U. S. 58, 63.

"Peaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product. The proviso indicates no more than that the Senate conferees' constitutional doubts led Congress to authorize publicity other than picketing which persuades the customers of a secondary employer to stop all trading with him, but not such publicity which has the effect of cutting off his deliveries or inducing his employees to cease work. On the other hand, picketing which persuades the customers of a secondary employer to stop all trading with him was also to be barred." 377 U. S. 58, 70.

"We come then to the question whether the picketing in this case, confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under Section 8(b)(4)(ii). We hold that it did not fall within that area, and therefore did not 'threaten, coerce, or restrain' Safeway." 377 U. S. 58, 71.

"When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer." 377 U. S. 58, 72.

We also note that Justice Black concurred in the judgment of the Court on the grounds that product picketing or consumer picketing as occurred in *Tree Fruits* was protected by the First Amendment guarantee of freedom of speech.  377 U. S. 58, 76.

Also see, *NLRB* v. *Servette, Inc.* (1964), 377 U. S. 46; *Bakery & Pastry Drivers, Local 802,* v. *Wohl* (1942), 315 U. S. 769; *Milk Wagon Drivers Local 753* v. *Lake Valley Farm Products* (1940), 311 U. S. 91; *NLRB* v. *Carpenters District Council* (8th Cir. 1970), 422 F. 2d 309; *NLRB* v. *Carpenters District Council* (8th Cir. 1967), 383 F. 2d 89; *Cedarcrest Hats, Inc.,* v. *Hatters Union* (5th Cir. 1966), 362 F. 2d 322; *NLRB* v. *Upholsterers Local 61* (8th Cir. 1964), 331 F. 2d 561; *Wholesale Employees Local 261* v. *NLRB* (D. C. Cir. 1960), 282 F. 2d 824.

The Supreme Court of the United States, in interpreting Section 158(b)(4), Title 29, U. S. Code (the secondary boycott provision), made a distinction between an unlawful secondary boycott and a secondary consumer boycott, including picketing, deciding that the latter, as defined in *Tree Fruits*, was primary in nature and thus valid and lawful.  As we have already noted, this is also the position of numerous state courts.

Because the Congress of the United States pre-empted the field of labor law, and since Ohio does not have similar legislation to control in cases that are exempt from the National Labor Relations Act, we will adopt and follow the principle of *Tree Fruits* and recognize the distinction between an unlawful secondary boycott and a lawful secondary consumer boycott.

A peaceful product or secondary consumer boycott that is educational, informational and considered part of the primary labor dispute is valid and lawful.  Such boycott must not be forceful, coercive, conducted under restraint and directed against the secondary employer to such an extent that it is considered a traditional secondary boycott.

UFWOC should therefore be allowed to publicize its dispute with Antle by the use of picketing, signs, leaflets, handbills, speeches, advertisements in newspapers and on radio and television, and to generally seek support from the

public not to buy Antle lettuce. But defendants' activities should be directed only against Antle and its products and not against plaintiff and its customers.

The trial court therefore properly restrained UFWOC from conducting any forceful or coercive activities directly against the plaintiff and its customers. The injunction should not enjoin all boycott activity by the defendants, only such activity which is directed against the plaintiff and its retail customers.

Defendants argue that the trial court's injunction is so overbroad as to bar the defendants from advocating a consumer boycott of Antle lettuce at the premises of retail sellers.

A careful reading of the trial court's injunction and restraining order might lead one to conclude that the court's order *does permit* a lawful secondary consumer boycott. However, this interpretation is not stated in the court's order (paragraphs 5 and 6) with requisite clarity.

In order to avoid any misinterpretation or misunderstanding of the court's order, this opinion is written to clarify and modify said order to conform with our holding that a secondary consumer boycott, as defined in *Tree Fruits*, is valid and lawful. Paragraphs 5 and 6 of the injunction and restraining order are hereby modified to be consistent with the Supreme Court's ruling in *Tree Fruits* and the holding of this court.

The judgment of the trial court is affirmed, as modified.

*Judgment affirmed as modified.*

SILBERT and JACKSON, JJ., concur.